IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 16, 2008

Charles R. Fulbruge III
Clerk

No. 07-60185

SARA LEE BAKERY GROUP, INC., and its wholly owned subsidiary, THE
EARTHGRAINS COMPANY,

                                    Petitioners-Cross-Respondents,

v.

NATIONAL LABOR RELATIONS BOARD,

                                    Respondent-Cross-Petitioner.

Petition for review and cross-petitioner for enforcement of an order of the
National Labor Relations Board
Board No. 25-CA-29803

Before REAVLEY, STEWART, and OWEN, Circuit Judges.

CARL E. STEWART, Circuit Judge:

This appeal comes to this Court on petition from the Sara Lee Bakery
Group, Inc. and its wholly owned subsidiary, the Earthgrains Company ("the
Company") seeking review of an order of the National Labor Relations Board
("the Board") issued against the Company. The Board has also filed a cross-
application, seeking enforcement of its order. We grant the Company's petition
for review, and enforce the Board's order in part and deny in part.

I. FACTUAL AND PROCEDURAL BACKGROUND

The Sara Lee Bakery Group, Inc. operates approximately fifty bakeries
across the United States, including one located in Owensboro, Kentucky,

belonging to its wholly owned subsidiary, The Earthgrains Company.[1]  At all times relevant for this appeal, the Owensboro bakery used two types of drivers to deliver its product: route sales drivers (who drove baked goods to retail establishments) or transport drivers (who drove tractor-trailer trucks and transported baked goods to other bakeries and depots owned by Sara Lee). Chauffeurs, Teamsters, and Helpers Local Union No. 215 ("the Union") has served as the collective-bargaining representative for both the route sales and transport drivers; Larry Murray was the Union's business agent responsible for contract enforcement at the facility while Billy Ballard was the drivers' steward. The Union negotiated a collective bargaining agreement ("CBA") that was in effect from May 10, 2005 to May 10, 2007 which provided, inter alia, a grievance procedure culminating in arbitration.

Sara Lee also operates a bakery in London, Kentucky, approximately 220 miles southeast of Owensboro.  The transport drivers at the London bakery are employed by an unaffilated delivery-services company, Worldwide Logistics ("Worldwide").   The Worldwide drivers are not members of the Owensboro bargaining unit and are not represented by the Union in this case.

In 2002, the General Manager of the London bakery, William Baird,[2] implemented a cross-docking system for the Owensboro and London bakeries to deliver products to each other.  Under this system, transport drivers from London and Owensboro would meet at the Louisville, Kentucky depot, unhook and trade their trailers, and then return to their respective bakeries with the necessary inter-bakery product.  Cross-docking served as a felicitous means of

---

[1] Even though these appeals involves actions that took place exclusively in Kentucky, we have jurisdiction in this case because the Company transacts business in this circuit.

[2] During the period of time relevant for this case, Baird's position at the Company shifted.  In 2002 and 2003, Baird was the general manager at the London bakery, but for a period in 2003 and 2004, he served as the manager for both the Owensboro and London bakeries.  In the fall of 2004, he assumed the position of plant manager at Owensboro.

streamlining the delivery process; it was also convenient because at the time the system was implemented, both bakeries were already servicing the Louisville depot. Before the cross-docking system was implemented, the exclusive method for delivering product between London and Owensboro was via a transport driver who originated in London: the transport driver would deliver Owensboro-bound product by making a direct run from London to Owensboro. On the return trip, the driver would "backhaul" London-bound products to the London bakery. It is undisputed that the Owensboro transport drivers have never directly delivered product to the London bakery.

While there was a period in 2002 where there was no truck making the direct London-Owensboro run, eventually scheduling problems and market changes required re-institution of direct runs between the two bakeries. Specifically, the Company introduced a new cottage loaf bread product that was only baked in London, and as a result five days a week a London transport driver needed to make a run to Owensboro. Additionally, there were occasions when the Owensboro bakery would not meet the output requirement by the time the transport driver had to leave to cross-dock at Louisville. In those situations, London drivers would backhaul the product to the London bakery. The amount of backhauling increased substantially during the summer of 2005, when the Company introduced another new product, wholegrain white bread, that was only baked at Owensboro and had to be delivered to the London bakery.

Throughout this time, Murray, Ballard, and other Union officials complained to the Company about its backhauling practice. Finally, on July 28, 2005, the Union filed a grievance on the matter. The grievance cited an incident that had happened a few days earlier when a Worldwide driver accidently drove a trailer from Owensboro to London that was supposed to have been driven by an Owensboro transport driver to Louisville. That incident violated specific provisions of the CBA. On August 18, 2005, the parties met to discuss the

grievance and the Company's backhauling policy more generally. Baird informed Murray and Ballard that the direct London to Owensboro run would end soon, thus significantly limiting the amount of backhauling that would occur; the Company also stated that it, nevertheless, had the right to backhaul products under the terms of the CBA.

Despite this meeting, the Union continued to have concerns about backhauling, and accordingly filed another grievance on September 20, 2005. The parties met again on October 11, 2005, and Baird explained that the practice of backhauling was being curtailed and would end completely once the Owensboro bakery gained certification to produce additional products. At this meeting, Murray presented Baird with a written request for information regarding Worldwide, based on the Union's belief that the Company had misled it about the extent of its backhauling practice. Murray requested that the Company provide the following information:

1. The name, address, and phone number of the subcontracting company [Worldwide] [Paragraph One];
2. The number of baskets hauled in 2005 to date by that entity, stating the date and amount hauled for each date [Paragraph Two];
3. The price paid to the [entity] for the loads and the total amount paid to date [Paragraph Three];
4. The total miles to date driven by each driver performing subcontracting work, for each day performed [Paragraph Four];
5. Copies of any letters of agreement, e-mails, contracts, or anything else reflecting the agreement between the company and the subcontractor [Paragraph Five].

The letter also stated that Baird should "further consider this our demand to bargain on this new round of subcontracting work."

After this meeting, Murray wrote a letter to the Company advising it that the Union was advancing its grievance to arbitration. The Company responded to the Union's information request six weeks later on November 22, 2005. In its response, the Company denied that the Union had lost any work due to the

backhauling, highlighting that the Company had actually hired an additional Owensboro transport driver during the relevant period. The Company also declined to provide the requested information. On November 28, 2005, the Union filed an unfair labor practice charge with the Board alleging, inter alia, that the Company violated Sections 8(a)(5) and (1) of the National Labor Relations Act ("the Act"),[3] 29 U.S.C. §§ 158(a)(5) & (1), by failing to provide information sought by the Union. In response, the Company argued that the information sought by the Union is irrelevant to the grievances, and that the Company did not have records which specified the amount of product moved from the Owensboro plant via backhaul by London trucks.[4]

On February 14, 2006, the Company supplemented its response to the Union's request for information. In this response, the Company provided the information requested in paragraph one of the Union's original request, but refused to provide any other information. The Company disputed the Union's categorization of the backhauling practice as "subcontracting," and maintained that the act of backhauling, which had been a longstanding practice, did not violate the CBA. Further, the Company explained that it could not provide the

---

[3] Under Section 8(a)(5) of the Act, an employer's "refusal to bargain collectively with the representatives of his employees" constitutes an "unfair labor practice." 29 U.S.C. § 158(a)(5). Under Section 8(a)(1) of the Act, an employer also commits an "unfair labor practice" when it "interefere[s] with, restrain[s], or coerce[s] employees in the exercise of their [collective bargaining] rights." The Supreme Court has written that an employer who violates Section 8(a)(5) also commits a "derivative" violation of Section 8(a)(1). See Metropolitan Edison Co. v. Board, 460 U.S. 693, 698 n.4 (1983).

[4] The Company uses "Load Sheets" (a computer generated document which reflects the types and quantities of product to be sent from a bakery to a destination on a given day) and "Transport Sheets" (a handwritten sheet that reflects the types and quantities of product on each truck) to keep track of the product that is delivered by the transport drivers. Not only do neither of those documents specify what amount of product was backhauled by a London driver on a particular day, but also the Company only keeps the Load and Transport Sheets for seven days before they are discarded.

requested mileage data since it does not keep that information.[5]  The Company also stated that the Union's request for cost and contract information had no bearing on any legitimate Union interest.

Two weeks later, the Regional Director of the Board filed a complaint and a notice of hearing, alleging that the Company had unreasonably delayed its response to the information requested in paragraph one, and that the Company had unlawfully refused to provide the other information sought by the Union. In its answer, the Company denied the material allegations and asserted the defenses of confidentiality and waiver by the Union. The administrative law judge ("ALJ") rejected the Company's defenses, and concluded that the Company had violated Sections 8(a)(5) and (1) of the Act because it failed to provide relevant information requested by the Union, and it unreasonably delayed providing other relevant information requested by the Union. The ALJ ordered the Company to cease and desist from refusing to bargain collectively with the Union, and ordered it to provide the Union with the information that was requested in paragraphs two, three, four, and five. The Company was also ordered to make a reasonable effort to secure any unavailable information, and if such information remained unavailable, it was required to explain and document the reasons for its unavailability.[6] The Company filed exceptions to the judge's decision, but a three member panel of the Board affirmed the ALJ's rulings, findings, and conclusions, and adopted the recommended order. The

---

[5] The Company did write in the letter that "from at least March 2002 through September 2005, on an average of approximately three times per week, a truck emanating from London would backhaul less than approximately half a load of product from Owensboro to London."

[6] The ALJ also ordered the Company to provide the Board's Regional Director with sworn certification setting forth the Company's efforts to retrieve the Union's requested information from the Company's computerized and electronic databases as well as the Company's efforts to obtain information from its parent company, appropriate subsidiaries, and from its contracting partner, Worldwide. Finally, the order required the Company to post a remedial notice.

Company filed a petition for review before this Court on March 1, 2007; the Board filed a cross-application for enforcement of its order on March 27, 2007.

## II. STANDARD OF REVIEW

We review the Board's factual findings under a substantial evidence standard. Selkirk Metalbestos, North Am., Eljer Mfg., Inc. v. NLRB, 116 F.3d 782, 786 (5th Cir. 1997). "The Supreme Court has defined substantial evidence as 'more than a scintilla. It means such relevant evidence as a reasonable mind would accept to support a conclusion.'" Id. (internal citation omitted). We review the NLRB's legal conclusions de novo; however if the NLRB gives a "reasonably defensible" construction of a statute, we will affirm that decision. Asarco, Inc. v. NLRB, 86 F.3d 1401, 1406 (5th Cir. 1996). In agreement with other circuits, we have explained that the NLRB's "determination of the relevance of the information sought in a particular case must be given great weight by the courts, if only because it is a finding on a mixed question of law and fact which is within the particular expertise of the Board." NLRB v. Brazos Elec. Power Coop., 615 F.2d 1100, 1101 (5th Cir. 1980); see also NLRB v. Champion Labs., 99 F.3d 223, 227 (7th Cir. 1996).

## III. DISCUSSION

### A. Uncontested Findings

The Board first contends that before this Court, the Company has only contested the following portions of the its order: that it produce the number of baskets backhauled by Worldwide drivers (paragraph two), that the Company produce its contract with Worldwide (paragraph five), and that it produce the costs associated with that contract (paragraph three). Therefore, the Board seeks summary enforcement of the two findings that the Company has not challenged on appeal: that the Company unreasonably delayed providing Worldwide's contact information (paragraph one), and that it must produce the total number of miles driven by Worldwide drivers (paragraph four).

Case law has established that when an employer does not challenge a finding of the Board, the unchallenged issue is waived on appeal, entitling the Board to summary enforcement. See NLRB v. Brookshire Grocery Co., 919 F.2d 359, 363 n.2 (5th Cir. 1990); Montgomery Ward & Co. v. NLRB, 385 F.2d 760, 765 (8th Cir. 1967). Similarly, the Sixth Circuit has explained that "[a]n employer's failure to address or take issue with the Board's findings and conclusions with regard to . . . violations [of the Act] effectively results in abandonment of the right to object to those determinations." NLRB v. Talsol Corp., 155 F.3d 785, 793 (6th Cir. 1998). Here, the Company has never, in its briefs or during oral argument, taken issue with the Board's findings regarding paragraphs one and four. Since the Company "has wholly failed to contest" these findings, the Board is entitled to summary enforcement. See id. at 794.

B. Unavailable Information

The Board next argues that the Company failed to show that information relating to the number of baskets hauled in 2005 by Worldwide drivers (paragraph two) is unavailable. It argues that the Company only engaged in a cursory search for the information, and it did not conduct a reasonable inquiry to determine whether the information is available from other, obvious sources, such as its parent company, its sister bakeries, or Worldwide itself. In response, the Company argues that it cannot be held liable for violating Sections 8(a)(5) and (1) of the Act for failing to provide information it does not have. It explains that it does not keep records reflecting the data the Union sought in paragraph two, and even though that data could be extrapolated from its Load and Transport Sheets, it destroys those documents after seven days.

Case law has consistently held that an employer cannot be held liable under the Act for failing to produce information it does not have. See Vanguard Fire & Supply Co., Inc., 345 N.L.R.B. No. 77, *42-43 (2005), enforced, 468 F.3d 952 (6th Cir. 2006); see also In re Kathleen's Bakeshop, LLC, 337 N.L.R.B. 1081,

1082 (2002), enforced, 2003 WL 22221353 (2d Cir. 2003) (explaining than an employer "cannot be expected to provide information that it does not have."). But employers do have an obligation to make reasonable efforts to secure any unavailable information. Congreso de Uniones Industriales de Puerto Rico v. NLRB, 966 F.2d 36, 38 (1st Cir. 1992) (writing that an employer's duty to supply relevant information also "extends to situations where the information is not in the employer's possession, but where the information can likely be obtained from a third party with whom the employer has a business relationship that is directly implicated in the alleged breach of the collective-bargaining agreement.").

After reviewing the record, we find the Company's arguments unavailing. Even though it is unquestionable that the Company did not keep records about the amount of product that was backhauled from Owensboro by Worldwide drivers, we agree with the ALJ's finding that the Company "utterly failed to conduct a good faith inquiry" to determine whether the information was available from any other sources. While the Company responded that such attempts would be "futile," it does not seem implausible that some other source, particularly Worldwide, may in fact have some information that could provide insight on how much product was backhauled from Owensboro to London. It may very well be that such information simply no longer exists, but the Company is required to show that it could not obtain the requested information from other sources.

C.  Contract and Cost Information

Finally, the Board contends that substantial evidence supports its decision that the Company is obligated under the Act to turn over the remaining information requested by the Union, specifically its contract with Worldwide (paragraph five) and the costs associated with that contract (paragraph three). Without that information, the Board argues, the Union is unable to effectively

police the CBA, decide whether to pursue and arbitrate potential grievances, and decide whether to bargain over subcontracting work. The Company asserts that not only did the Union fail to articulate a purpose for why it was seeking this information, but also that the Board erroneously concluded that the Company's contracting cost and contract with Worldwide is relevant to the underlying dispute. According to the Company, the underlying grievance it has with the Union involves whether the practice of backhauling violates the CBA, and the Company's contracting cost and contract with Worldwide are irrelevant to that ultimate determination.

Section 8(a)(5) of the Act makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees . . . .". 29 U.S.C. § 158(a)(5). An employer is obligated to furnish, upon request, information that is relevant and necessary to the Union's performance of its duties as the employees' bargaining representative, including information concerning contract administration, negotiations, and grievance processing. NLRB v. Acme Indus. Co., 385 U.S. 432, 435-37 (1967) ("the duty to bargain unquestionably extends beyond the period of contract negotiations and applies to labor-management relations during the terms of an agreement"); Detroit Edison Co. v. NLRB, 440 U.S. 301, 304 (1979). The key question in determining whether information must be produced is "one of relevance." Emeryville Research Ctr. v. NLRB, 441 F.2d 880, 883 (9th Cir. 1971). While a union's request for bargaining unit data, such as wage and benefit information, is considered presumptively relevant, when a union requests non-bargaining unit data, such as subcontracting costs, that information is not considered presumptively relevant. NLRB v. Leonard B. Herbert, Jr. & Co., 696 F.2d 1120, 1124 (5th Cir.), cert. denied, 464 U.S. 817 (1983). Rather, the union has the initial burden of establishing relevancy before the employer must comply with the information request. Id. "The Supreme Court has adopted a liberal,

discovery-type standard by which relevancy of requested information is to be judged." Id. (citing Acme Indus. Co., 385 U.S. at 438 & n.6). In Acme, the Court explained the Union need only be "acting upon the probability that the desired information was relevant and that it would be of use to the union in carrying out its statutory duties and responsibilities." 385 U.S. at 437.

Case law also explains that in order for a union to prove that an employer has violated Sections 8(a)(5) and (1) the union is required to make two showings before the ALJ. First, the union must show, at the time of the information request, that it articulated a legitimate purpose for seeking the information. S&W Motor Lines, Inc. v. NLRB, 621 F.2d 598, 602 (4th Cir. 1980). Second, the union has to show that the information it requested bears a logical relationship to a legitimate union purpose. See Selkerk Metalbestos, 116 F.3d at 789. Because the Union failed to make either showing, we reject the position advocated by the Board.

First, the Union failed, at the time it made its information request, to articulate a purpose for seeking the company's contracting costs and contract with Worldwide. Since the information being requested is not bargaining unit data, the Union's failure to articulate nothing more than a "bare assertion" of relevancy falls short. See Detroit Edison Co., 440 U.S. at 314 ("A union's bare assertion that it needs information to process a grievance does not automatically oblige the employer to supply all the information in the manner requested."). The Board counters by highlighting its decision in Brazos Elec. Power Coop., 241 N.L.R.B. 1018, 1019 (1979), enforced, 615 F.2d 1100 (5th Cir. 1980), where it held that if the circumstances surrounding the union's information requests are "reasonably calculated to put the employer on notice of the union's relevant purpose," the employer is obligated to provide the information even if the Union has not explicitly stated its relevance. See also Island Creek Coal Co., 292 N.L.R.B. 480, 490 & n.19 (1989), enforced, 899 F.2d 1222 (6th Cir. 1990).

However, even assuming arguendo that the circumstances surrounding the information request should have put the Company on notice that the Union's information request was related to the practice of backhauling generally, the Union never articulated a reason why the Company's contract and contracting costs with Worldwide were specifically relevant. We also agree with the Company that the ALJ's attempt to manufacture a post hoc theory of relevance violates well-established precedent. See NLRB v. A.S. Abel Co., 624 F.2d 506, 513 n.5 (4th Cir. 1980) (explaining that the NLRB cannot point out ways in which the information may have been relevant, when those reasons were not brought to the employer's attention contemporaneously); Calmat Co., 283 N.L.R.B. 1103, 1106 (1987) (explaining that a union cannot rely on a reason proffered for the first time at the administrative hearing).

Second, the Board never demonstrated how the Company's contracting costs and contract with Worldwide are logically connected to any legitimate union purpose. A union may legitimately request information if the information is necessary to either (1) negotiate a new CBA or (2) to administer/police an existing CBA. General Electric Co. v. NLRB, 916 F.2d 1163, 1168 (7th Cir. 1990). The Union's CBA was not set to expire for another two years, and there was no evidence presented which suggested that contract negotiations were likely to occur in the near future. See San Diego Newspaper Guild v. NLRB, 548 F.2d 863, 868-69 (9th Cir. 1977) (rejecting a union's claim for information when the CBA was not up for renewal for two years and there was no evidence of contract negotiations). To the extent that the Union contends that it needed the information in order to police its CBA with the Company, it failed to demonstrate before the ALJ why it needed information regarding the contract and contracting costs between the Company and Worldwide in order to do so. In Western Massachusetts Electric Co. v. NLRB, 573 F.2d 101, 105 (1st Cir. 1978), the court explained that a union is required to make a showing that the

requested information is "specially relevant to the bargaining taking place." No such showing was made by the Union here. The issue underlying the Union's grievance is whether backhauling violates the CBA; information regarding the contract or contracting cost are irrelevant to that ultimate determination. Either the CBA allows backhauling or it does not. Additionally, the Union's argument that it needs this information to police its CBA is undercut by the fact that the practice of London drivers backhauling product from Owensboro had occurred for years.

Further, we acknowledge the "generally-recognized rule" that contracting costs are only relevant if the union can show that the employer justified its contracting to the Union on the basis of cost. See Western Mass., 575 F.2d 101 (1st Cir. 1978); see also Connecticut Yankee Atomic Power Co., 317 N.L.R.B. 1266 (1995). There is no evidence in the record that either Murray or Ballard ever testified that Baird told them that the company decided to use Worldwide drivers to backhaul products because Worldwide provided cheaper labor.[7] In Western Mass., the First Circuit wrote that the Board, when determining whether an employer has put cost into contention, should not operate under a theory that "subcontracting costs are always relevant in a collective bargaining context." Id. at 107. However, at its core, the Board's argument in support of the Union does exactly that.

We agree with the Company that this case is similar to the factual situation presented to the Board in Connecticut Yankee. 317 N.L.R.B. 1266. In that case, the ALJ found that the employer, a nuclear plant operator, violated the Act when it failed to provide the union with requested information about an outside contractor. Id. at 1266. In deciding against the union, the Board

---

[7] Baird did testify that he had conversations with the London manager about the use of backhauling that did involve discussions regarding cost effectiveness, but he explained that the Union was not privy to those conversations.

explained that the union's requests for information were vague, and that the union had failed to prove that the information was relevant, as there was no evidence that union members had lost any work. Id. at 1268-69. The Board also highlighted the fact that the company had been contracting with the outside contractor for years, and the union had previously never complained. Id. at 1269. Similarly, in this case, the Union failed to present the ALJ with sufficient evidence to prove that either the information regarding the Company's contract and contracting costs with Worldwide was relevant or that the Company had done anything to put cost into contention.

## IV. CONCLUSION

For the foregoing reasons, the Company's petition for review is granted. The Board is entitled to summary enforcement of its findings regarding paragraphs one and four, and we hold that there is substantial evidence to support the Board's findings regarding paragraph two; accordingly the Board's order is enforced in part. However, since the information requested in paragraphs three and five is not relevant to the underlying labor dispute, we deny enforcement of the Board's order in part.