**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 21, 2011

No. 10-60705

Lyle W. Cayce
Clerk

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

versus

PDK INVESTMENTS, L.L.C.,

Respondent.

On Application for Enforcement of
an Order of the National Labor Relations Board
No. 16-CA-26292

Before SMITH and STEWART, Circuit Judges.[*]

JERRY E. SMITH, Circuit Judge:[**]

The National Labor Relations Board (the "Board") held PDK Investments,

---

[*] Judge Garwood was a member of this panel but died, after oral argument, on July 14, 2011. This matter is decided by a quorum. *See* 28 U.S.C. § 46(d).

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-60705

L.L.C. ("PDK"), in violation of the National Labor Relations Act ("NLRA") for refusing to provide information about its operations to the union representing its employees. Because it was reasonable for the Board to conclude that the requested information was relevant to the union's duties to police its collective bargaining agreement, we grant the application for enforcement.

I.

PDK is an electrical contractor in the construction business in the Dallas area. It has previously done business under the name "Guild Electric." It is a member of the North Texas Chapter of the National Electrical Contractors Association ("NECA") and, as such, was a party to the collective bargaining agreement in effect in 2008 between NECA and the International Brotherhood of Electrical Workers, Local Number 20 ("the union"). As part of that agreement, PDK agreed to accept the union as the exclusive collective bargaining representative of its electrical workers in the union's jurisdiction.

A.C. McAfee, the business manager and secretary of the union, testified to the NLRB about reports from a former PDK employee that led him to "be concerned" that PDK "was operating an alter ego" that employed non-union employees in violation of its contract with the union. According to McAfee, former PDK employee and union member Rudy Ayala told the union that PDK had offered him a job on the "nonunion side" of the company. Ayala also allegedly said that a company called Guild Commercial and Tenant Services ("GCATS") was operating out of the same location with the same officers as PDK. PDK says that what Ayala told the union was not credible because, after a project run by Ayala went 185% over budget, PDK had demoted him from foreman to journeyman electrician, after which he quit. According to PDK, Ayala was merely spreading false rumors to retaliate against PDK for his demotion.

Shortly after his conversation with Ayala, McAfee sent a letter to PDK's

2

part-owner Keith Zagar saying that the union "has become aware that your company has been operating [GCATS] as a nonunion company" and requesting information "concerning [PDK's] relationship with [GCATS] for the purpose of administering the [collective bargaining] Agreement." McAfee attached a questionnaire with seventy-nine questions seeking detailed information about PDK's relationship with its purported nonunion affiliate.

After sending the letter, McAfee further investigated the possible connection between PDK and GCATS. He said that he found a website—which he did not identify—that showed a number of companies with the "Guild" name operating out of PDK's address, with common officers. He also assigned union officer Chris Williams to observe PDK's facilities and work sites. According to McAfee, Williams reported seeing GCATS performing electrical work at buildings at which PDK had previously worked and a truck with the word "Guild" on the side delivering materials to both union and non-union jobs.

In addition, McAfee testified that PDK employee and union member Benny Terrell gave him a written statement (which McAfee submitted to the Board) alleging that PDK's part-owner, Paul Prachyl, had earlier informed Terrell and employee Tom McMann that "Guild Commercial and Guild Electric [as PDK was previously known] would be splitting up and not share [sic] the same office space." Guild Commercial would remain with the "open," i.e., non-union, shop, and "the union side" would change its name to PDK and find new office space. Prachyl also allegedly told Terrell that the "union side would sub work from the open shop side as needed." Terrell says Prachyl instructed him to paint over the "Guild name on our ladders and tools and mark PDK" but that the trucks would continue to bear the "Guild" name. PDK argues that Terrell's statements were not credible because, like Ayala, Terrell had been demoted for large project overruns and was merely trying to retaliate against PDK for his demotion.

No. 10-60705

Zagar responded to McAfee's letter by asking for the "particular relevance" of McAfee's questions. McAfee responded by letter explaining that "it was brought to Local 20's attention that furloughed union members were being encouraged to perform work for the nonunion side of the shop" and that "the alleged nonunion side has been performing work that in the past has been performed union." He further explained that "Guild Electric, Guild Technologies, PDK Investments, and/or GCATS Investments have been sharing the same office, mailing address, website, warehouse, equipment and personnel." He said that it had come to his attention that the companies in question had made several "operational changes" since his previous letter, and he requested that PDK apprise him of those changes.

Zagar responded in a letter calling the questionnaire a "fishing expedition." He admitted that PDK had moved offices recently to get closer to customers and "hopefully grow its business" but stated that PDK had not made any other changes to its business. PDK refused to provide any more information.

## II.

The Board's General Counsel filed a complaint, later amended, alleging that PDK had violated section 8(a)(1) and (5) of the NLRA, 29 U.S.C. § 158(a)(1) and (5). Those provisions make it "an unfair labor practice for an employer— (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7 of this title[1]" and "(5) to refuse to bargain collectively

---

[1] Section 7 says,

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as

(continued...)

4

No. 10-60705

with the representatives of his employees, subject to the provisions of section 9(a) of this title [29 U.S.C. § 159(a)]."

An administrative law judge ("ALJ") held a hearing and issued a decision from the bench that PDK was in violation of section 8(a)(1) and (5) from the date of its last letter refusing to provide the information requested by the union. The ALJ ordered PDK to furnish the union with the information requested in its letter—i.e., to answer the union's seventy-nine questions—and to bargain collectively in good faith with the union. A then-two-member NLRB (Chairman Liebman and Member Schaumber) affirmed and adopted the ALJ's decision, with the exception of the order to bargain collectively in good faith with the union, because that was "not warranted to remedy this information request violation."

Following *New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635, 2638 (2010), holding that a Board consisting of merely two members does not have the statutory authority to exercise the delegated powers of the full Board, a three-member panel (Chairman Liebman and Members Schaumber and Pearce) adopted and incorporated by reference the previously-vacated two-member decision.

### III.

The issue is whether the Board reasonably held that the union satisfied its burden of proof to show that it was entitled to the information it requested. We review the Board's legal conclusions *de novo*, but we will uphold its construction of a statute if it is "reasonably defensible." *Sara Lee Bakery Grp., Inc. v. NLRB*, 514 F.3d 422, 428 (5th Cir. 2008). We review its factual findings under

---

[1] (...continued)
a condition of employment as authorized in section 8(a)(3) [29 U.S.C. § 158-(a)(3)].

29 U.S.C. § 157.

a substantial-evidence standard. *Id.* Substantial evidence means "'more than a scintilla. It means such relevant evidence as a reasonable mind would accept to support a conclusion.'"[2]

## A.

The duty to bargain collectively includes the duty "to provide information needed by the bargaining representative for the proper performance of its duties." *NLRB v. Acme Indus. Co.*, 385 U.S. 432, 435-36 (1967). That duty "unquestionably extends beyond the period of contract negotiations" and, as here, "applies to labor-management relations during the term of an agreement." *Id.* at 436.

Refusal to furnish information to a bargaining representative "may constitute a breach of the employer's duty to bargain in good faith." *NLRB v. CJC Holdings, Inc.*, 97 F.3d 114, 117 (5th Cir. 1996) (per curiam) (internal quotation marks and citation omitted). The "key inquiry" is whether the information the union seeks is "relevant to its duties." *NLRB v. Leonard B. Hebert, Jr. & Co., Inc.*, 696 F.2d 1120, 1124 (5th Cir. 1983). Relevance is judged by a "liberal, discovery-type standard," *id.* (citing *Acme*, 385 U.S. at 438 & n.6), according to which the union, in making its request, must have been "'acting upon the probability that the desired information was relevant and that it would be of use to the union in carrying out its statutory duties and responsibilities.'" *Sara Lee*, 514 F.3d at 430-31 (quoting *Acme*, 385 U.S. at 437).

The union bears the burden of showing relevance where, as here, the requested information is "not ordinarily pertinent" to the union's performance as a bargaining representative but is "alleged to have become relevant due to

---

[2] *Selkirk Metalbestos, N. Am., Eljer Mfg., Inc. v. NLRB*, 116 F.3d 782, 786 (5th Cir. 1997) (per curiam) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)).

particular circumstances."[3]  The union must make two showings to satisfy its burden:  First, it must demonstrate that, at the time of the information request, it articulated a legitimate purpose for seeking the information.  *Sara Lee*, 514 F.3d at 431.  *Post hoc* theories of relevance cannot justify information requests. *Id.* Second, the union must show that the information requested bears a logical relationship to that legitimate union purpose.  *Id.*

The union satisfies its burden of showing a legitimate union purpose only by demonstrating "'a reasonable belief supported by objective evidence for requesting the information.'"[4]  In the case of a suspected alter-ego or single-employer relationship,[5] that means that the union must have a "reasonable

---

[3] *See Leonard B. Hebert*, 696 F.2d at 1124 (holding that the union "has the initial burden of showing relevancy" where it alleges that the employer is using "double breasted operations" to evade contractual obligations with the union, i.e., the employer is allegedly operating two corporations, one hiring strictly union employees, and the other, nonunion employees, to compete for both union and nonunion work); *Shoppers Food Warehouse Corp.*, 315 N.L.R.B. 258, 259 (1994) ("[W]here, as here, the information sought concerns matters outside the bargaining unit, such as those related to single employer or alter ego status, a union bears the burden of establishing the relevance of the requested information.").

[4] *Advanced Constr. Servs., Inc. v. NLRB*, 247 F.3d 807, 812 (8th Cir. 2001) (quoting *Shoppers Food Warehouse*, 315 N.L.R.B. at 259).  We have used somewhat different language, namely, that the union must provide a "reasonable basis to suspect" that labor violations occurred.  *Leonard B. Hebert*, 696 F.2d at 1125 (internal quotation marks and citation omitted).  But the Board employs the "reasonable belief" standard in its brief and in its decision, *PDK Invs., LLC*, 354 N.L.R.B. No. 1 (Apr. 24, 2009).  It is also the standard of preference in its caselaw.  *See, e.g., Disneyland Park*, 350 N.L.R.B. 1256, 1257-58 & n.4 (2007) (asking whether the union demonstrated "a reasonable belief, supported by objective evidence, that the requested information is relevant" and stating that "the Board applies a uniform standard for evaluating the relevance of information requests involving matters outside the bargaining unit, although it has sometimes articulated this standard using slightly different language.").  Because the Board's legal standard is "reasonably defensible," it applies.  *Sara Lee*, 514 F.3d at 428; *see Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005) ("A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion.").

[5] An "alter ego" relationship refers to "the relation between an employer and a substantially identical corporate predecessor, where the change in corporate form is attributable to anti-union animus." *Advanced Constr. Servs.*, 247 F.3d at 812.  By contrast, "if the companies

(continued...)

belief, supported by objective evidence, that [the entities at issue] were alter egos" or a single employer. *See Advanced Constr. Servs.*, 247 F.3d at 812. The meaning of the phrase "a reasonable belief supported by objective evidence" is the focus of our discussion.

PDK argues that the union's evidence is insufficient to establish a "reasonable belief supported by objective evidence," because it is all unreliable hearsay. The Board counters that hearsay can be objective evidence sufficient to support a reasonable belief. The Board points to its many decisions holding that a union may rely on hearsay and need not show that its evidence is "accurate or ultimately reliable." *E.g.*, *Shoppers Food Warehouse*, 315 N.L.R.B. at 259. The issue is one of first impression in our circuit.

PDK is correct that the reliability of the union's evidence matters, and there are limits on how unreliable the evidence, on which the union bases its information request, can be. Otherwise, unions could harass or otherwise improperly burden employers with spurious, yet onerous, information requests. Thus, a union must rely on "objective evidence" for its information request where it bears the burden of proof to show relevance, *Advanced Constr. Servs.*, 247 F.3d at 812, which means it must rely on evidence external to its "'own (subjective) impressions.'"[6] Secondly, the union must rely on enough evidence, and reliable enough evidence, that its belief that an alter ego or single-employer relationship exists is "reasonable." *See id.*

But allowing hearsay at the information-request stage in the complaint

---

[5] (...continued)
are operated simultaneously rather than successively, the term 'single employer' would generally be used." *Id.*

[6] *See NLRB v. B. A. Mullican Lumber & Mfg. Co.*, 535 F.3d 271, 280 (4th Cir. 2008) (emphasis omitted) ("Objective evidence is evidence 'external to the employer's own (*subjective*) impressions.'" (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 368 n.2 (1998))); *cf. Sara Lee*, 514 F.3d at 431 (holding that a "'bare assertion' of relevancy falls short" of satisfying the union's burden).

No. 10-60705

process is consistent with the "liberal, discovery-type standard" for information requests that the Supreme Court has adopted.[7]  Hearsay is not being introduced at this stage to establish the truth of the union's claims, but only to show the reasonableness of the union's belief that a violation occurred, thereby justifying its request for further information.[8]  It is not *per se* unreasonable for a union to believe an employer has an alter ego based purely on hearsay.  Rather, the reasonableness of the union's belief must depend, case-by-case, on the overall strength of the evidence on which it relies.

### B.

The evidence that the union relied on is "objective" in the relevant sense: McAfee testified about what union members told him they heard from PDK management, about what he saw on a website, and what his subordinate said he saw PDK doing.  Those hearsay statements may be factually inaccurate, but they involve sensory observations of facts, not mere subjective "impressions" about what PDK might have been up to.[9]

Secondly, a "reasonable mind would accept" the NLRB's conclusion that the union reasonably believed that an alter-ego or single-employer relationship existed.[10]  Although the evidence supporting the union's request was hearsay,

---

[7] *See Leonard B. Hebert*, 696 F.2d at 1124 (noting the Court's "liberal, discovery-type standard" (citing *Acme*, 385 U.S. at 438 & n.6)).

[8] *See Acme*, 385 U.S. at 437 (explaining that "[t]his discovery-type standard decide[s] nothing about the merits of the union's contractual claims"); *Dodger Theatricals Holdings, Inc.*, 347 N.L.R.B. 953, 969 (2006) ("[T]he issue here is not whether the [trade journal] article is or is not accurate, but whether the Union acted reasonably in relying on the article.").

[9] *See B.A. Mullican*, 535 F.3d at 280 (holding that employees' statements that they no longer supported the union were "objective evidence" despite being hearsay).

[10] *See Selkirk Metalbestos*, 116 F.3d at 786 (explaining that the agency must provide only "'such relevant evidence as a reasonable mind would accept to support a conclusion'"
(continued...)

9

and some of McAfee's sources may have had axes to grind with PDK, McAfee relied on multiple sources who gave detailed and consistent information about PDK's alleged wrongdoing, as well as the union's own independent investigation, to reach his conclusion.

McAfee said Ayala told him that he was offered a job with the "nonunion" side of PDK, that it was called GCATS, and that it was run out of the same location and by the same officers as PDK. McAfee then said he found a website listing a number of companies with the "Guild" name operating out of the same address as PDK and with common officers. In addition, he said his subordinate saw GCATS working at former PDK jobs and "Guild" trucks catering to union and non-union jobs. Terrell's written statement also corroborated Ayala's claims and gave additional information, and PDK's admission that it had moved offices corroborated Terrell's statement. And the ALJ found McAfee credible. On the sum of that evidence, the NLRB's conclusion that the union had a legitimate purpose for seeking information is reasonable.

## C.

The last issue is whether the information the union requested in its letter (i.e. the seventy-nine questions) bears a logical relationship to its legitimate purpose. We give "'great weight'" to the Board's determination that information is relevant, because it is "'a finding on a mixed question of law and fact which is within the particular expertise of the Board.'" *Sara Lee*, 514 F.3d at 431 (quoting *NLRB v. Brazos Elec. Power Coop.*, 615 F.2d 1100, 1101 (5th Cir. 1980)).

Even PDK concedes that the same seventy-nine questions were upheld

---

[10] (...continued)
(quoting *Universal Camera*, 340 U.S. at 477)).

previously by the Board in alter ego/single employer contexts.[11]  PDK argues only that, because its collective-bargaining agreement does not prohibit subcontracting or double-breasting, many of the questions are irrelevant.  But the ALJ found, and the Board agreed, that all the requested information related to the factors that the Board would consider in an alter-ego or single-employer case.[12] We defer to the Board's finding that the questions bear a logical relationship to the union's legitimate purpose.

The application for enforcement of the order is GRANTED.

---

[11] Resp't's Br. 22 (citing *Pub. Serv. Elec. & Gas co.*, 323 N.L.R.B. 1182, 1186-88 (1997), *enf'd*, *NLRB v. Pub. Serv. Elec. & Gas Co.*, 157 F.3d 222 (3d Cir. 1998)); *see also Brisco Sheet Metal, Inc.*, 307 N.L.R.B. 361, 361 (1992) (ordering responses to questions because of a possible alter ego relationship); Resp't's Br. 27 (conceding that *Brisco* involved the same seventy-nine questions).

[12] For example, determining whether an alter ego relationship exists requires deciding, among other things, whether the "two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *J. Vallery Elec., Inc. v. NLRB*, 337 F.3d 446, 451 (5th Cir. 2003).  Determining single-employer status involves similar considerations.  *See NLRB v. DMR Corp.*, 699 F.2d 788, 790-91 (5th Cir. 1983).