# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 1, 2021

Lyle W. Cayce
Clerk

No. 20-60229

Oncor Electric Delivery, L.L.C.,

*Petitioner/Cross-Respondent*,

*versus*

National Labor Relations Board,

*Respondent/Cross-Petitioner*.

Petition for Review of an Order and Decision of the
National Labor Relations Board
No. 16-CA-212174

Before Owen, *Chief Judge*, and King and Engelhardt, *Circuit Judges*.
Per Curiam:*

Presently before us is the petition for review filed by Oncor Electric Delivery, LLC, and the cross-application for enforcement filed by the National Labor Relations Board. Oncor petitions us to review and set aside the March 6, 2020 decision and order rendered by the National Labor Relations Board ("Board") insofar as the Board concluded that Oncor had

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 20-60229

violated Sections 8(a)(5) and (1) of the National Labor Relations Act. The Board cross-applies for enforcement in full of the March 6, 2020 order. For each, we GRANT IN PART and DENY IN PART as stated herein.

I.

Oncor is an electric utility company with a facility in Dallas, Texas, where the International Brotherhood of Electrical Workers, Local Union No. 69 ("Union") represents a "bargaining unit" of approximately 600 employees. Oncor and the Union are parties to a collective-bargaining agreement that expressly forbids Oncor from using non-unit employees to perform bargaining-unit work if doing so would cause a reduction in work for unit employees. The bargaining unit includes "Troublemen," who the Board describes as the "first responders" charged with assessing damage to power lines in the aftermath of a storm. Their job is to secure the scene and perform a "storm evaluation" to determine the cause of the outage, repair what they can, and create work orders for additional repairs if necessary.

On May 4, 2017, the Union filed a grievance alleging that Oncor had violated the parties' contract by using non-unit employees to troubleshoot the electrical grid after a storm that occurred on March 29, 2017. On May 23, 2017, Oncor denied the grievance to the extent that it related to a March 29, 2017 incident involving Troubleman James Chapman. Oncor also denied the May 4, 2017 grievance to the extent that the Union sought to challenge the practice of assigning storm evaluation work to non-unit employees, referred to as "Damage Evaluators." According to Oncor, this "well-known practice," in which "[Oncor] and the industry in general have engaged [] for many years[,] . . . is in no way correlated to the number of linemen employed by the Company." On October 6, 2017, the Union filed a supplemental grievance, contending that Oncor had violated the collective bargaining agreement "by utilizing non-bargaining unit personnel for damage evaluation

No. 20-60229

and/or storm evaluation work," which is "bargaining unit work" for which "Oncor should be using bargaining unit employees."

Shortly after filing its first grievance, the Union submitted requests for information to Oncor regarding work by non-unit employees. For the next year, the Union (through Business Manager Bobby W. Reed) and Oncor exchanged numerous letters debating whether the Union was entitled to the non-unit employee and work information that it sought. Over time, Oncor gradually agreed to and did provide more information. In particular, information provided to the Union, on May 11, 2018, included a list of the non-unit employees—identified by a unique number (but not name), job title, annual salary, and hire date—who had received "Storm Exception Pay," along with the amount and date of that payment.[1] Oncor also provided a list of persons (also identified by unique number, not name) who had received "damage evaluation" training and the date of that training.

Oncor steadfastly refused, however, to provide the actual names of the non-unit employees who were assigned to do "storm evaluation" work. Nor could an agreement be reached as to the Union's request for information identifying what work the non-unit employees performed, as well as when

---

[1] Attached to Oncor's May 11, 2018 correspondence are two multi-page lists of data that it compiled in response to Requests 1, 2, 4, 5 and, as renumbered, Request 12 (originally Request 18). Regarding Request 5, which seeks the name and amount, if any, of additional pay or compensation provided for "storm evaluation work" completed by non-unit employees, since January 1, 2016, Oncor's list identifies the amount of "Storm Restoration Pay" provided to non-unit employees on a given date. Oncor maintains, however, that its records do not allow it to delineate whether the pay was specifically for "storm evaluation work." Regarding the date on which the work was performed, rather than the pay date, Oncor adds, in response to Requests 3 and 5, that it does not have methodology or documents that track or reflect the date or amount of "storm evaluation work" completed by non-unit employees. As stated below, however, Oncor did offer to make its work orders available to the Union for review (if the Union believed reviewing those records would provide relevant information).

No. 20-60229

and where that work occurred.  Oncor offered to allow the Union to access thousands of "work orders" (in an effort to identify some of this information) but a dispute remained about redaction of customer information and responsibility for thousands of dollars of copying costs. A confidentiality agreement was discussed—in order to avoid the time and cost of redaction—but the Union never provided the proposed agreement that Oncor requested. Nor did it demand that Oncor prepare a draft.  Instead, the Union decided to await a decision from the Administrative Law Judge ("ALJ") and, if necessary, the Board, regarding the information dispute.

In a decision dated April 4, 2019, the ALJ determined the discovery dispute in the Union's favor.  Thereafter, in a decision and order dated March 6, 2020, the Board affirmed the ALJ's decision except with respect to Request 6 (reason for work assignments) and Request 7 (work orders and other documents reflecting non-unit damage evaluation work assignments) for which it found that no violation of the National Labor Relations Act had occurred.  For Request 6, the Board concluded that the Union had not established the relevance of Oncor's reasons for assigning work to non-unit employees.  For Request 7, the Board agreed that the documents sought, including work orders for each incident of storm evaluation, were relevant. Nevertheless, the Board also determined that Oncor had established its confidentiality claim and had met its duty to bargain towards an accommodation with the Union. The instant petition for review and cross-application for enforcement followed.

## II.

Section 8(a)(5) of the National Labor Relations Act (NLRA) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). The duty to bargain collectively includes providing "information that is needed by the bargaining representative for the proper performance of its duties." *NLRB v. Acme Indus. Co.*, 385 U.S. 432, 435–36 (1967). Thus, "[a]n employer is obligated to furnish, upon request, information that is relevant and necessary to the Union's performance of its duties as the employees' bargaining representative, including information concerning contract administration, negotiations, and grievance processing." *Sara Lee Bakery Grp., Inc. v. NLRB,* 514 F.3d 422, 430 (5th Cir. 2008) (citing *Acme Indus. Co.,* 385 U.S. at 435–37 ("the duty to bargain unquestionably extends beyond the period of contract negotiations and applies to labor-management relations during the terms of an agreement")). The employer's duty is triggered only when the information is necessary and relevant to a legitimate union purpose and the union communicates that purpose at the time of the request. *Sara Lee Bakery*, 514 F.3d at 431.

A union's request for bargaining unit data, such as wage and benefit information of unit employees, is considered presumptively relevant. *NLRB v. Leonard B. Hebert, Jr. & Co.*, 696 F.2d 1120, 1124 (5th Cir. 1983). On the other hand, the same presumption of relevance does *not* apply to requests for non-bargaining unit data. *Sara Lee Bakery*, 514 F.3d at 430. Thus, when a union requests non-bargaining unit data, the union must establish that the requested information is necessary and relevant to the union's performance of its duties as the employees' bargaining representative. *Id.* In determining whether a union has met its burden to establish the relevance of the requested information, a "discovery-type" standard applies, and whether the union has

met this burden hinges on the circumstances of each particular case. *See Acme Indus. Co.*, 385 U.S. at 437 n.6; *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 314–15 (1979) (citing *NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 153 (1956)). Although "not a demanding standard, [] it is not a non-existent one either." *NLRB v. Temple-Eastex, Inc.*, 579 F.2d 932, 938 (5th Cir. 1978).

Notably, "[a] union's bare assertion that it needs information to process a grievance does not automatically oblige the employer to supply all the information in the manner requested." *Detroit Edison Co.*, 440 U.S. at 314; *see also F.A. Bartlett Tree Expert Co., Inc.*, 316 N.L.R.B. 1312, 1313, 1995 WL 238413, at *3 (1995) (("The basis for the request, i.e., that the information contained in the contracts is necessary to make a reasonable wage proposal is nothing more than another way of saying that it is needed 'to bargain intelligently' and this general claim is simply insufficient to establish relevance.") (quoting *E. I. Dupont de Nemours & Co. v. NLRB,* 744 F.2d 536 (6th Cir. 1984)). But the burden of showing a legitimate union purpose can be satisfied by demonstrating "a reasonable belief supported by objective evidence for requesting the information." *NLRB v. PDK Invs., LLC.*, 433 F. App'x 297, 301 (5th Cir. 2011) (quoting *Advanced Constr. Servs., Inc. v. NLRB*, 247 F.3d 807, 812 (8th Cir. 2001)).

## III.

We review the Board's factual findings under a substantial evidence standard. *Selkirk Metalbestos, N. Am., Eljer Mfg., Inc. v. NLRB*, 116 F.3d 782, 786 (5th Cir. 1997). "The Supreme Court has defined substantial evidence as 'more than a scintilla. It means such relevant evidence as a reasonable mind would accept to support a conclusion.'" *Id.* (internal citation omitted). We review the NLRB's legal conclusions *de novo*. However, if the NLRB gives a "reasonably defensible" construction of a statute, we will affirm that decision. *Asarco, Inc. v. NLRB*, 86 F.3d 1401, 1406 (5th Cir. 1996). "In

No. 20-60229

agreement with other circuits, we have explained that the NLRB's 'determination of the relevance of the information sought in a particular case must be given great weight by the courts, if only because it is finding on a mixed question of law and fact which is within the particular expertise of the Board.'" *Sara Lee Bakery*, 514 F.3d at 428 (quoting *NLRB v. Brazos Elec. Power Coop.*, 615 F.2d 1100, 1101 (5th Cir. 1980)).

IV.

For the sake of clarity, we begin our analysis by stating our agreement with the Board's assessment of Requests 6 and 7, *i.e.*, that no violation of Section 8(5) of the NLRA occurred. Focusing next on Requests 1–5 and 8–13, the parties' submissions confirm that much of what remains in dispute regarding these information requests turns on Oncor's refusal to provide the names of the non-unit workers to the Union. Based on our review of the parties' submissions, the record in this matter, and applicable law, we find the Board erred in ordering Oncor to provide the names of non-unit workers to the Union.

In support of this determination, we emphasize that Oncor has never disputed that its non-unit workers have performed storm evaluation work. Thus, as the Board's decision and order recognize, the only contractual question to be answered is whether Oncor's assignment of "storm evaluation work" to non-unit workers led to a reduction of the regular work hours of unit workers. The names of the various non-unit employees performing these services have no obvious relevance to that inquiry. Nor has the Union established that relevance. Accordingly, on the showing made, we reverse the Board's March 6, 2020 order to the extent that, for Requests 1–5 and 8–13, it would require Oncor to identify, by individual names, the non-unit employees who have performed storm evaluation work. Otherwise, to the extent that additional responsive information and/or documents are

7

No. 20-60229

available, have not already been provided to the Union, and are not protected by our ruling regarding Request 6 or 7, we affirm the Board's March 6, 2020 decision and order requiring their production.[2]

Lastly, we reverse the Board's decision insofar as it adopted the ALJ's incorrect identification of the unit of employees for which the Union is the designated exclusive bargaining representative.[3] Rather, as certified in National Labor Relations Board Case No. 16-RC-10746, the pertinent unit is properly defined as follows:

> Include: All full-time distribution employees employed by the Employer in the following job classifications: Cablesplicer A, Cablesplicer B, Cablesplicer SR, Equipment Operator A,

---

[2] Relative to that production, the parties are instructed to communicate regarding the information sought/available in a manner designed to accomplish the production of relevant information in the most efficient and cost-effective method that balances the duties and needs of *all* involved. For example, the parties' briefs suggest that Oncor may be able to filter and sort its work orders in ways that might lessen the burden and cost of document production/review while, at the same time, provide an adequate (if not comprehensive) amount of information to the Union.

[3] The ALJ's April 4, 2019 decision erroneously identifies the relevant bargaining unit of workers as:

> **INCLUDED:** All regular employees . . . including Lineman, Troubleman, Journeyman Lineman, Serviceman, Apprentice 6, Apprentice 5, Apprentice 4, Apprentice 3, Apprentice 2, Apprentice 1, Lineman Helper 2, Lineman Helper 1, Service Specialist, Sr., Service Specialist, Utility, Mechanic Garage, Field Dispatcher-Distribution, Cable Splicer Sr., Cable Splicer 6, Cable Splicer 5, Cable Splicer 4, Cable Splicer 3, Cable Splicer 2, Cable Splicer 1, Network Helper 2, Network Helper 1, Meter System Specialist Sr., Meter System Specialist 2, Meter System Specialist 1, Storekeeper Sr., Storekeeper, Distribution Specialist Sr., Cable Pulling Sr., Equipment Operator, and Network Specialists Sr.

> **EXCLUDED:** All other employees, officer clerical employees, guards and supervisors as defined in the Act.

No. 20-60229

Equipment Operator B, Equipment Operator SR, Lineman A, Lineman B, Lineman SR, Materials Coordinator, Material Coordinator SR, Serviceman A, Serviceman SR, Troubleman A, Troubleman SR, and Utility Worker.

Exclude: All other TXU Electric Delivery employees, including crew foremen, technical employees, equipment operators assigned to the SOSF, office clerical employees, all employees in the classifications and divisions covered by the NLRB certifications in Case Nos. 16-R-951, 16-R-1078, 16-R-1079; all transmission employees, and guards and supervisors as defined in the Act.

V.

As stated herein, we GRANT IN PART and DENY IN PART Oncor's petition for review and the Board's cross-application for enforcement.