# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-60106

REMINGTON LODGING & HOSPITALITY, L.L.C.,

Petitioner Cross-Respondent

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent Cross-Petitioner

United States Court of Appeals
Fifth Circuit

**FILED**

January 27, 2017

Lyle W. Cayce
Clerk

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board

Before DAVIS, DENNIS, and SOUTHWICK, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Remington Lodging & Hospitality, LLC ("Remington") petitions for partial review of a National Labor Relations Board ("NLRB" or the "Board") order finding that it violated Sections 8(a)(1) and (3) of the National Labor Relations Act ("NLRA"). The Board cross-petitions for enforcement of the order. For the reasons set out below, we **DENY** Remington's petition for partial review and **ENFORCE** the order.

No. 16-60106

## I.

We have jurisdiction to decide this case pursuant to Sections 10(e) and (f) of the NLRA.[1] "We review the NLRB's legal conclusions *de novo* and its 'factual findings under a substantial evidence standard.'"[2] "'Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion. It is more than a mere scintilla and less than a preponderance.'"[3] "In making this determination, 'we may not reweigh the evidence, try the case *de novo*, or substitute our judgment for that of the NLRB, even if the evidence preponderates against the NLRB's decision.'"[4] "'Only in the most rare and unusual cases will an appellate court conclude that a finding of fact made by the NLRB is not supported by substantial evidence.'"[5]

## II.

Remington challenges two of the Board's findings. Because these two findings are unrelated, we discuss each separately and in turn.

## A.

Remington is a hotel management company that, in December 2011, was hired to manage the Hyatt Regency Long Island hotel (the "Hyatt" or the "Hotel"). The Hotel, at the time, outsourced its housekeeping department to a staffing company called Hospitality Staffing Services ("HSS"). It was also one of the poorest performing Hyatt-branded properties, in terms of guest-satisfaction scores, in the United States.

---

[1] *See* 29 U.S.C. § 160(e)—(f).

[2] *Flex Frac Logistics, L.L.C. v. N.L.R.B.*, 746 F.3d 205, 207 (5th Cir. 2014) (quoting *Sara Lee Bakery Grp., Inc. v. N.L.R.B.*, 514 F.3d 422, 428 (5th Cir. 2008)).

[3] *Id.* at 207—08 (quoting *El Paso Elec. Co. v. N.L.R.B.*, 681 F.3d 651, 656 (5th Cir. 2012)) (alteration omitted).

[4] *Id.* at 208 (quoting *El Paso*, 681 F.3d at 656—57) (alterations omitted).

[5] *Ibid.* (quoting *Merchants Truck Line, Inc. v. N.L.R.B.*, 577 F.2d 1011, 1015 n.3 (5th Cir. 1978)) (alteration omitted).

No. 16-60106

Upon taking over as property manager, Remington decided to terminate the Hotel's contract with HSS, consistent with its general preference to directly employ its employees. Meanwhile, the Hotel's guest-room component score – which serves as the primary indicator of housekeeping effectiveness and is measured against an average benchmark of 50 – continued to decline. In March, it was 20.4. In April, it was 6.0. In May, it was 8.3. And in June, it was 1.1.

On June 28, 2012, Remington contacted HSS about re-outsourcing the Hotel's housekeeping department, citing the aforementioned scores and unrelated financial considerations. On August 16, 2012, Remington and HSS executed a new outsourcing agreement ("the 2012 HSS contract"), which took effect on August 21, 2012. On February 12, 2016, the Board held that the 2012 HSS contract was motivated, at least in part, by anti-union animus and that it therefore violated Sections 8(a)(1) and (3) of the NLRA.

Remington challenges this finding on both factual and legal grounds. We begin with the law. Section 8(a)(1) states that employers may not "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" by the NLRA.[6] Section 8(a)(3) states that employers may not discriminate "in regard to hire or tenure of employment . . . to encourage or discourage membership in any labor organization."[7] Although the protections of Section 8(a)(3) and Section 8(a)(1) "are not contemporaneous, a violation of [the former] constitutes a derivative violation of [the latter]."[8]

Where, as here, Section 8 allegations turn on employer motivation, they are analyzed under the burden-shifting framework first established in *N.L.R.B. v. Wright Line, a Division of Wright Line, Inc.*, 662 F.2d 899 (1st Cir.

---

[6] 29 U.S.C. § 158(a)(1).

[7] 29 U.S.C. § 158(a)(3).

[8] *Metro. Edison Co. v. N.L.R.B.*, 460 U.S. 693, 698 n.4 (1983).

3

No. 16-60106

1981), and approved by the Supreme Court in *N.L.R.B. v. Transportation Management Corp.*, 462 U.S. 393, 400—01 (1983), abrogated in part on other grounds, *Director, Office of Workers' Compensation Programs, Department of Labor v. Greenwich Collieries*, 512 U.S. 267, 276—77 (1994).[9] Pursuant to this framework, the initial burden rests with the General Counsel to show, by a preponderance of the evidence, that the employer undertook an adverse employment action motivated, at least in part, by anti-union animus.[10] The burden then shifts to the employer to show, by a preponderance of the evidence, that it would have taken the adverse action "regardless of any [anti-union] animus."[11] An employer who would have taken the same action regardless of any anti-union animus has not violated Section 8.

Remington argues that in order to violate Section 8(a)(3), the General Counsel must produce evidence that the employer's "discrimination in fact caused or resulted in a discouragement of union membership" which, in this case, the General Counsel failed to do. That requirement, however, is completely inconsistent with our precedent. We have held that Section 8(a)(3) "makes it unlawful for an employer to discriminate against employees . . . *for the purpose* of discouraging membership in a labor organization."[12] The General Counsel need not prove discouragement as a matter of fact.

---

[9] *N.L.R.B. v. Arkema, Inc.*, 710 F.3d 308, 320—21 (5th Cir. 2013); *see MCPC Inc. v. N.L.R.B.*, 813 F.3d 475, 487—90 (3d Cir. 2016) (distinguishing *Wright Line* from the framework established in *N.L.R.B. v. Burnup & Sims, Inc.*, 379 U.S. 21, 23 (1964)); *Shamrock Foods Co. v. N.L.R.B.*, 346 F.3d 1130, 1135—36 (D.C. Cir. 2003) (same).

[10] *Ahearn v. Jackson Hosp. Corp.*, 351 F.3d 226, 238 (6th Cir. 2003) (citing *Trans. Mgmt. Corp.*, 462 U.S. at 399—403); *Poly-Am., Inc. v. N.L.R.B.*, 260 F.3d 465, 488 (5th Cir. 2001) (internal quotations omitted).

[11] *Arkema*, 710 F.3d at 321.

[12] *New Orleans Cold Storage & Warehouse Co. v. N.L.R.B.*, 201 F.3d 592, 599–600 (5th Cir. 2000) (emphasis added).

No. 16-60106

Now on to the facts. Remington argues that the Board's finding that the 2012 HSS contract violated Sections 8(a)(1) and (3) is not supported by substantial evidence. Having reviewed all of evidence, we disagree.

Jose Vega, a union activist, began visiting the Hotel in April 2012, and union activity commenced shortly thereafter. Nina Palacios, a Remington housekeeper, testified that in May 2012, Remington Supervisor Percida Rosero approached her and asked whether she had been asked to participate in a union meeting. Veronica Flores, a Remington housekeeper, testified that in June 2012, the Hotel's then-director of housekeeping, Andrew Arpino, called her into his office and asked whether she "knew anything about a union." No more than 28 days later – perhaps coincidentally and perhaps not – Remington, for the first time in over six months, initiated contact with HSS and discussed outsourcing its employees. [13]

Also relevant is a conversation that took place on August 22, 2012, the day after the 2012 HSS contract took effect. Remington employee Maritz Torres approached Rosero and asked "what was going on," *i.e.*, why did Remington choose to re-outsource the Hotel's housekeeping department to HSS? "[B]ecause of the Union," Rosero replied.

Remington did not address this exchange in its petition or its reply. But even assuming that Rosero was not "personally involved in [Remington's] decision" to re-outsource the Hotel's housekeeping department, Rosero's statement provides "an explanation" that she, "as a supervisor," was qualified

---

[13] *Valmont Indus., Inc. v. N.L.R.B.*, 244 F.3d 454, 465 (5th Cir. 2001) (Section 8 does not require "[o]vert direct evidence of an unlawful motive . . . . Circumstantial evidence of discriminatory animus may be sufficient" depending on, *inter alia*, "the timing of the employer's action in relationship to union activity . . . .").

to give.[14] Such a "definitive" statement, in these circumstances, constitutes substantial evidence of unlawful motive sufficient to withstand our deferential standard of review.[15]

We have considered Remington's argument that it decided to remain a joint employer under the second HSS contract so as to evince a desire not "to avoid [its] duty to bargain with a union." Ultimately, however, "[w]e must pay 'special deference' to the [Board's] conclusion that [an] employment decision was illegally motivated . . . where, as here, conflicting evidence requires that essential credibility determinations be made."[16]

**B.**

Remington also challenges the Board's finding that its decision to discharge Hotel employee Margaret Loiacono ("Loiacono") violated Section 8(a)(1) of the NLRA. The facts relevant to Loiacono's discharge were well laid out by the Board majority.

> In late December 2012, as part of its campaign against the Union, [Remington] distributed to each employee a pie chart setting forth the employee's compensation and how it was allocated. The ostensible purpose of the chart was to demonstrate to employees that they received compensation and benefits beyond their base salary. On December 30, Loiacono, a lobby ambassador charged with greeting guests, left her post for 10 to 15 minutes to discuss her pie chart with Supervisor Yohenna Borrero. Loiacono informed Borrero that the chart was inaccurate because it allocated a portion of her compensation to a uniform allowance, and she did not wear a uniform. Loiacono stated that other employees' charts might also contain mistakes. Later that day, Loiacono repeated her concerns to [Remington's] general manager, Jeff Rostek, and suggested that the chart be corrected. Still later that day,

---

[14] *Tcb Sys., Inc. & Serv. Employees Int'l Union, Local 32bj, Successor to Serv. Employees Int'l Union, Local 11*, 355 NLRB 883, 885 (2010), enf'd, *TCB Sys., Inc. v. N.L.R.B.*, 448 F. App'x 993, 996 (11th Cir. 2011).

[15] *See id.*

[16] *N.L.R.B. v. Brookwood Furniture, Div. of U.S. Indus.*, 701 F.2d 452, 464 (5th Cir. 1983).

management spoke to Loiacono and two other employees about the difficulty employees would face in obtaining a collective-bargaining agreement and [Remington's] purported freedom not to honor one.

The next day, [Remington's] housekeeping manager, Andrew Arpino, sent [General Manager] Rostek an email containing a "statement" of Supervisor Borrero recounting her conversation with Loiacono the previous day. The statement purported to be Arpino's typewritten transaction of Borrero's oral account. According to the statement, Loiacono asserted that [Remington] should pay her the equivalent of a uniform allowance and should do the same for Borrero, accused [Remington] of "lying to the people," said "that [what Remington was doing] was against the law," and threatened to sue the hotel. The statement also noted that Loiacono had been communicating with another employee, Ken, about the pie chart discrepancies, and that Loiacono was waiting for Ken to discuss the issue with [General Manager] Rostek. [Remington] discharged Loiacono on January 2, 2013.

The Board recognized, and both sides concede, that Loiacono was not engaged in protected activity when she was terminated. Yet the Board still held that Loiacono's discharge violated Section 8(a)(1) of the NLRA. Remington argues that without finding the former, the Board cannot hold the latter. We disagree.

The NLRA protects both actual and "alleged union activities."[17] "Thus, proof of an unfair labor practice does not require proof of actual union activity; it is sufficient if the employer was motivated by suspected union activity in discharging the employee."[18] "The same is true if an employer" acts to prevent

---

[17] *N.L.R.B. v. Link-Belt Co.*, 311 U.S. 584, 589—90 (1941).

[18] *Holyoke Visiting Nurses Ass'n v. N.L.R.B.*, 11 F.3d 302, 307 (1st Cir. 1993); *see Saffels v. Rice*, 40 F.3d 1546, 1549 (8th Cir. 1994) (citing numerous cases in which courts have held that the NLRA protects employees who "did not actually engage in" protected activity).

No. 16-60106

future protected activity.[19] Employers cannot bypass the protections of the NLRA by launching a "pre-emptive strike."[20]

Now, once again, on to the facts. The lawfulness of Loiacono's termination necessarily turns on motive. We therefore analyze it under the same *Wright Line* burden-shifting framework outlined *supra*.[21] Substantial evidence is the standard. We cannot simply re-weigh the evidence and displace those findings with which we disagree.[22]

As a "lobby ambassador," Loiacono was required to be in the lobby at all times. She was the Hotel's "lead cheerleader" – telling incoming guests hello, wishing outgoing guests goodbye, and addressing any complaints brought to her attention. Remington argues that Loiacono's decision to leave her post at 11:30 a.m. on a Sunday morning – "a heavy checkout time" – was indefensible, and that it previously terminated two "similarly situated" lobby ambassadors for doing the same thing. Remington's attempted use of comparators is consistent with our precedent insofar as it recognizes that an employer who would have taken the same action regardless of any anti-union animus has not violated Section 8. We, however, find that the Remington comparators were not "similarly situated" to Loiacono.

---

[19] *Dover Energy, Inc. v. NLRB*, 818 F.3d 725, 730 (D.C. Cir. 2016).

[20] *Parexel Int'l*, 356 NLRB 516, 517 (2011); *see Dover Energy*, 818 F.3d at 730 (citing *Parexel*); *N.L.R.B. v. RELCO Locomotives, Inc.*, 734 F.3d 764, 790 (8th Cir. 2013) (discussing *Parexel*).

[21] *See Sutter E. Bay Hosps. v. N.L.R.B.*, 687 F.3d 424, 434 (D.C. Cir. 2012) (noting that *Wright Line* applies "when an employee is disciplined for a reason purportedly unrelated to any protected activity, such as a discharge for theft or poor performance"); *Citizens Inv. Servs. Corp. v. N.L.R.B.*, 430 F.3d 1195, 1198 (D.C. Cir. 2005) (analyzing an alleged Section 8(a)(1) violation under *Wright Line*).

[22] *See Inova Health Sys. v. N.L.R.B.*, 795 F.3d 68, 80 (D.C. Cir. 2015) (referring to any NLRB evidentiary challenge as "a hard hill to climb"); *Brookwood Furniture*, 701 F.2d at 464 ("While it is true that illegal motive for an employment decision may not be lightly inferred, it is also axiomatic that once the Board has made such an inference, a reviewing court may not lightly displace the Board's factual finding of discriminatory intent.").

No. 16-60106

The Remington comparators were fired for ignoring guests in order to engage in a sports discussion with each other. Loiacono was fired for leaving the lobby to discuss, with Remington, material that it distributed in order to advance its antiunion campaign. Loiacono did not ignore any guests, and Rostek never sought to the end the conversation.

Remington argues that we are getting lost in the details. That Loiacono and the comparators were all fired for the same offense, and that Remington has therefore proven that it would have taken the same action regardless of any anti-union animus. But the details are important, and the Board was entitled to consider the substance of the conversation. An employer violates Section 8(a)(1) when it acts with the intent to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" by the NLRA,[23] and a conversation about unionization may implicate the rights guaranteed by the NLRA more than a conversation about sports.

## III.

For the foregoing reasons, we **DENY** Remington's petition for partial review and **ENFORCE** the order.[24]

---

[23] 29 U.S.C. § 158(a)(1).

[24] The Board made numerous findings that Remington did not address in its petition. Specifically, the Board found: (1) that Remington violated Section 8(a)(1) by unlawfully interrogating or threatening employees on six occasions from May through early August 2012; (2) that Remington violated Section 8(a)(1) by unlawfully interrogating or threatening employees on six occasions in late August and September 2012; (3) that Remington violated Section 8(a)(1) by stating in its campaign literature that it would more strictly enforce workplace rules if the employees voted to unionize; and (4) that Remington violated Sections 8(a)(1) and (3) by refusing to re-hire the incumbent housekeepers after it terminated the 2012 HSS contract. Remington has, by virtue of its silence, waived any objection to these findings, *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994), and they are therefore summarily enforced.