# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 11, 2021

Lyle W. Cayce
Clerk

No. 19-60630

CORDÚA RESTAURANTS, INCORPORATED,

*Petitioner Cross-Respondent*,

*versus*

NATIONAL LABOR RELATIONS BOARD,

*Respondent Cross-Petitioner*.

On Petition for Review of Decision and Order
of the National Labor Relations Board

Before DENNIS, HIGGINSON, and WILLETT, *Circuit Judges*.
STEPHEN A. HIGGINSON, *Circuit Judge*:

Petitioner Cordúa Restaurants asks us to review a decision and order of the National Labor Relations Board ("NLRB" or "Board") which found Cordúa to have violated the National Labor Relations Act ("NLRA" or "Act") by firing an employee for engaging in activities protected by the NLRA. The Board opposes Cordúa's petition on this finding, and it also cross-petitions for summary enforcement of its finding that Cordúa violated the NLRA by maintaining an impermissibly broad employee no-solicitation rule. We AFFIRM.

No. 19-60630

# I.

Cordúa operates food services businesses in the metropolitan Houston, Texas, area, including nine restaurants with the brand names "Churrascos"; "Américas"; "Amazón Grill"; and "Artista." Churrascos has five locations, including Churrascos River Oaks and Churrascos Sugar Land. Cordúa employs several hundred servers, kitchen staff, and bartenders at its nine restaurants.

## A.    The collective action lawsuit against Cordúa

Employee Steven Ramirez began working for Cordúa as a server at Churrascos River Oaks in September 2012. After working for Cordúa for nearly two-and-a-half years, Ramirez noticed discrepancies in his paychecks and began to question whether he was properly paid for his shifts. Ramirez discussed his concern with coworkers and found that they had experienced similar issues. Ramirez hired an attorney, and together they concluded that Cordúa was paying its restaurant employees below minimum wage, improperly crediting tips against its minimum wage obligations, and failing to pay overtime wages.

In January 2015, Ramirez filed a collective action complaint against Cordúa in federal district court. The complaint alleged that Cordúa had committed various violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq., and the Texas Minimum Wage Act, TEX. LAB. CODE §§ 62.001 et seq. Also in January 2015, an initial group of seven additional Cordúa employees joined the collective action lawsuit as plaintiffs.

Ramirez transferred restaurants from Churrascos River Oaks to Artista in March 2015. Soon after, Ramirez's Artista coworkers began asking him about his lawsuit. These coworkers shared that they had experienced similar wage and hour discrepancies. Ramirez referred these coworkers to his attorney.

2

In June 2015, Cordúa transferred Ramirez to Churrascos Sugar Land, though he continued to work shifts at Artista. Ramirez's Churrascos Sugar Land coworkers similarly asked Ramirez about the lawsuit and shared their experiences with paycheck discrepancies. By the end of June 2015, sixteen of Ramirez's coworkers had joined the collective action lawsuit, including five at Artista and one at Churrascos Sugar Land.

### B.    Cordúa's investigation and termination of Ramirez

At a company-wide meeting in early July 2015, Cordúa informed its general managers of the collective action lawsuit. Ramirez's general managers at Artista and Churrascos Sugar Land, Damian Ambroa and Rigo Romero, respectively, were in attendance. After the meeting, both Ambroa and Romero separately asked for a list of employees who had joined the lawsuit at their respective restaurants. Ambroa learned from other Artista employees that Ramirez was involved in the lawsuit shortly thereafter.

In mid-July 2015, Naomi Reichman, the assistant manager at Artista, called Ramirez to ask about the lawsuit. Reichman's husband, Eran, had recently been fired by Cordúa, and Reichman inquired whether she or her husband might qualify to join the lawsuit. Ramirez offered to send Reichman his lawyer's contact information. According to his testimony before the administrative law judge ("ALJ"), Ramirez also asked Reichman if she could review his payroll records to determine if his hours were correct. Reichman and Ramirez later exchanged text messages, during which Reichman discussed her plans to review Ramirez's payroll records.

Later in July, Reichman left her personal cellphone unattended in Artista's office during a shift. Ambroa, the general manager, noticed text message notifications on the cellphone's lock screen and used Reichman's password to access her cellphone. According to his testimony, Ambroa had previously received Reichman's permission to use her cellphone because his

No. 19-60630

own cellphone received a poor signal at the restaurant. Ambroa opened the cellphone's text message application, where he was able to view Reichman's recent text conversations. Ambroa toggled to a conversation between Reichman and a contact he knew to be Ramirez, took photographs of selected messages from the conversation with his own cellphone, and sent the photographs to Cordúa's chief operating officer, Fred Espinoza. As photographed, the text message conversation read:

| | |
|---|---|
| Reichman: | Ok… It's nomimandel |
| Ramirez: | Ok cool |
| | Just got it |
| | I'll make sure to ask him those questions that benefit you. I'll ask them again in front of [E]ran just so yall are sure yall protected. |
| Reichman: | I'm going to start storing stuff on flash drives |
| | Tomorrow . . . Do you remember when you started working at CRO [Churrascos River Oaks]? |
| Ramirez: | Hell yea |
| | Yeah august 2012 |
| | Training. On the floor September |
| Reichman: | Ok . . . Email this info to me . . . So that we have actual correspondence |
| Ramirez: | Ok will do it now |
| Reichman: | I'm going in early so no one sees me looking through this stuff . . . . |
| Ramirez: | On Monday right? |
| Reichman: | Tomorrow . . . . And I would like to see the lawyer on Monday |
| | What really sucks is that I found out that there are mit [managers-in-training] getting paid more than I am! |
| | Anyway I'm going to sleep . . . Keep in touch with email tomorrow because I leave my phone on the desk and Damian knows you started this and I don't want him to know |

4

No. 19-60630

Shortly thereafter, on July 26, 2015, Ambroa fired Reichman for drinking during her shifts. Later that evening, Reichman sent Ambroa a series of text messages referencing her firing and denying allegations that she accessed confidential employee information for Ramirez. Ambroa immediately called Espinoza and forwarded him screenshots of the messages. Cordúa never contacted Reichman to ask about her messages.

Espinoza sent the photographs of these text conversations to Cordúa's information technology department ("IT") and asked them to determine whether any confidential employee records had been taken. Approximately two weeks later, IT informed Espinoza that it was "more than likely" that no records had been taken.

Cordúa did not discuss this investigation with Ramirez in July or August 2015. Espinoza testified that he did not reach out to Ramirez in August because Cordúa's restaurants are very busy during that month due to Houston's "Restaurant Week."

Cordúa employees continued to join the collective action lawsuit in August and early September, including three additional Churrascos Sugar Land employees. As of September 1, 2015, nineteen employees had joined Ramirez's lawsuit, each of whom was employed at one of the three restaurants where Ramirez was working or had recently worked.

On September 4, 2015, Espinoza summoned Ramirez to a one-on-one meeting at Churrascos Sugar Land. Espinoza began the meeting by telling Ramirez, "We understand you have a lawsuit against us." Espinoza then stated to Ramirez that "[w]e respect your right to do that," before explaining that he was investigating an alleged attempt to access confidential personnel records. Espinoza asked Ramirez a series of questions about his communications with Reichman, including whether he had texted Reichman about obtaining records, sent texts to Reichman about a flash drive, or

received records from Reichman. Ramirez denied taking such actions and asserted that he only texted Reichman about scheduling. Espinoza also asked Ramirez if he would provide Cordúa access to his personal cellphone and, when Ramirez refused, asked him to put his refusal in writing. Ramirez again declined, stating that he wanted to speak with his lawyer before putting anything into writing. Several times during the meeting, Ramirez asked for permission to call his lawyer. Espinoza denied these requests, telling Ramirez that he could call his lawyer after they finished the meeting.

The next week, on September 10, 2015, Espinoza called Ramirez into a second meeting. Romero, general manager of Churrascos Sugar Land, was also present. Espinoza informed Ramirez that Cordúa was investigating "[a] breach of confidential [] employee records including personal records, some payroll and time records." Espinoza stated that he had spoken to "various employees" about the investigation. Espinoza then told Ramirez, "Our investigation has revealed that you have worked with other employees that you know had access to employee records. You also were dishonest with me about accessing employee records and about texting [Reichman]." Ramirez responded that he did not ask Reichman for other employees' records, and that he did not need Reichman to do anything with his own records. Espinoza asked Ramirez to put his response in writing, but Ramirez answered that his attorney instructed him not to sign anything or write anything down. Ramirez asked for permission to call his lawyer, to which Espinoza replied that he could call his lawyer after the meeting. Espinoza concluded, "You violated our employee policies by accessing our employee records. You violated, also, lying to me about texting [Reichman] and accessing confidential employee records." Espinoza then fired Ramirez.

## C.    The NLRB complaint

Ramirez filed the instant complaint against Cordúa with the NLRB in the fall of 2015, alleging violations of the NLRA in connection with his firing.

No. 19-60630

On May 31, 2016, the NLRB's General Counsel issued a final consolidated complaint, alleging various violations of the NLRA by Cordúa.

The administrative law judge ("ALJ") held a five-day evidentiary hearing June 27 through July 1, 2016. On December 9, 2016, the ALJ issued a decision and order, finding that Cordúa violated Section 8(a)(1) of the NLRA[1] by maintaining an overbroad no-solicitation rule and by firing Ramirez for engaging in protected activities within the meaning of Section 7 of the Act.[2]

On April 26, 2018, the Board issued a decision and order affirming in part the ALJ's recommended findings. The Board affirmed the ALJ's finding that Cordúa violated Section 8(a)(1) of the NLRA by firing Ramirez for engaging in protected activities. The Board severed the no-solicitation rule allegation from the case and retained it for future resolution. On August 14, 2019, the Board issued a supplemental decision and order unanimously affirming the ALJ's finding that Cordúa violated Section 8(a)(1) of the NLRA by firing Ramirez for engaging in protected activities.[3] The Board also unanimously adopted the ALJ's finding that Cordúa further violated Section 8(a)(1) by maintaining an overbroad no-solicitation rule.

As to the no-solicitation policy, the Board ordered Cordúa to rescind its no-solicitation rule, provide employees with supplemental handbook inserts, and post a remedial notice to employees at its restaurants and electronically. As to Cordúa's firing of Ramirez, the Board ordered Cordúa

---

[1] Codified at 29 U.S.C. § 158(a)(1).

[2] Codified at 29 U.S.C. § 157.

[3] The Board's supplemental decision and order was unanimous as to the instant claims and cross-incorporated the reasoning of the Board's earlier decision and the ALJ decision.

No. 19-60630

to offer Ramirez full reinstatement to his former job or a substantially equivalent position, make Ramirez whole for any lost earnings or benefits, compensate Ramirez for any adverse tax consequences of receiving a lump-sum backpay award, and remove any reference to Ramirez's termination from its files.

Cordúa timely petitioned for review of the Board's decision and order.

## II.

We review the Board's findings of fact under a substantial evidence standard. *Sara Lee Bakery Grp., Inc. v. NLRB*, 514 F.3d 422, 428 (5th Cir. 2008). Under 29 U.S.C. § 160(e), the Board's findings of fact are "conclusive" if they are "supported by substantial evidence on the record considered as a whole." "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion. It is more than a mere scintilla, and less than a preponderance." *IBEW, AFL-CIO, CLC, Loc. Unions 605 & 985 v. NLRB*, 973 F.3d 451, 457 (5th Cir. 2020) (quoting *Creative Vision Res., L.L.C. v. NLRB*, 882 F.3d 510, 515 (5th Cir. 2018)). We may not "make credibility determinations or reweigh the evidence," and should "defer to the plausible inferences the Board draws from the evidence, even if [we] might reach a contrary result were [we] deciding the case de novo." *Id.* (quoting *Alcoa Inc. v. NLRB*, 849 F.3d 250, 255 (5th Cir. 2017)).

## III.

The Board asks us to grant summary enforcement of the portions of its order remedying Cordúa's impermissibly broad no-solicitation rule. Cordúa does not oppose the Board's request for summary enforcement, nor does it challenge the Board's finding that Cordúa's no-solicitation rule violated the NLRA. Findings of the Board that the employer does not challenge are waived on review, entitling the Board to summary enforcement.

*Sara Lee*, 514 F.3d at 429. The Board is therefore entitled to summary enforcement of its order remedying Cordúa's Section 8(a)(1) violation with respect to the no-solicitation rule. *Id.*

## IV.

We now turn to the Board's finding that Cordúa violated Section 8(a)(1) of the NLRA by firing Ramirez for engaging in activities protected by the Act. On review, Cordúa argues that substantial evidence does not support the Board's finding because (1) Ramirez's "attempt to acquire other employees' payroll information, without their permission, and lying to the COO about it" was not protected activity, (2) the Board "failed to make a finding regarding animus," (3) the record reflects a lack of animus, and (4) Cordúa's reasons for firing Ramirez were not pretextual. Cordúa further argues that the Board erred in ordering reinstatement and backpay because Ramirez "committed misconduct" and "perjured himself."

Section 8(a)(1) of the NLRA prohibits employers from interfering with, restraining, or coercing employees in the exercise of the rights guaranteed to them by Section 7 of the Act. 29 U.S.C. § 158(a)(1). Section 7 guarantees employees the "right to self-organization, to form, join, or assist labor organizations, . . . and to engage in other concerted activities for the purpose of . . . mutual aid or protection." 29 U.S.C. § 157. Relevant here, an employer violates Section 8(a)(1) when it discharges an employee for engaging in protected activities or attempts to prevent its employees from engaging in such activities in the future. *See Remington Lodging & Hosp., L.L.C. v. NLRB*, 847 F.3d 180, 185–86 (5th Cir. 2017).

In cases such as this one, where the alleged Section 8(a)(1) violation hinges on the employer's motivation for firing an employee, we apply the Board's *Wright Line* framework. *See New Orleans Cold Storage & Warehouse Co. v. NLRB*, 201 F.3d 592, 600–01 (5th Cir. 2000) (citing *Wright Line*, 251

NLRB 1083 (1980), *enforced on other grounds*, 662 F.2d 899 (1st Cir. 1981)); *see also NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 401–04 (1983) (approving the *Wright Line* framework), *abrogated on other grounds*, *Dir., Office of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267 (1994). Under this framework, an employer's termination of an employee violates Section 8(a)(1) if the employee's protected conduct was a motivating factor in the decision to discharge the employee. *Wright Line*, 251 NLRB at 1089. The employee's protected activity need not be "the sole motivating factor" so long as the activity was "a substantial or motivating factor." *Adams & Assocs., Inc. v. NLRB*, 871 F.3d 358, 370 (5th Cir. 2017) (quoting *Transp. Mgmt. Corp.*, 462 U.S. at 401).

The Board may rely on circumstantial evidence to infer that an employee's protected activity was a motivating factor in an employer's decision to fire the employee. *Elec. Data Sys. Corp. v. NLRB*, 985 F.2d 801, 804–05 (5th Cir. 1993); *see also Remington Lodging*, 847 F.3d at 184 n.13. In particular, the Board may infer a discriminatory motive where the evidence shows that: (1) the employee engaged in concerted activities protected by Section 7; (2) the employer knew of the employee's engagement in those activities; and (3) the employer harbored animus toward the employee's protected activities. *Remington Lodging & Hosp., LLC*, 363 NLRB 112, at *2 & n.5 (Feb. 12, 2016), *enforced*, 847 F.3d 180 (5th Cir. 2017).

If the Board finds that an employee's protected activity was a motivating factor in an employer's termination decision, the employer may only avoid a finding of Section 8(a)(1) violation by proving, as an affirmative defense, that the employer would have fired the employee even if the employee had not engaged in the protected activities. *Transp. Mgmt.*, 462 U.S. at 401–02; *NLRB v. Delta Gas, Inc.*, 840 F.2d 309, 313 (5th Cir. 1988).

The Board's finding of a Section 8(a)(1) violation is reviewed for substantial evidence. *Tex. World Serv. Co. v. NLRB*, 928 F.2d 1426, 1435 (5th Cir. 1991); *see also* 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). We will not disturb the Board's finding of a discriminatory motive even if the record would allow a "competing, perhaps even equal, inference of a legitimate basis for discipline," as long as the Board "could reasonably infer an improper motivation." *NLRB v. McCullough Env't. Servs., Inc.*, 5 F.3d 923, 937 (5th Cir. 1993) (quoting *NLRB v. Brookwood Furniture, Div. of U.S. Indus.*, 701 F.2d 452, 467 (5th Cir. 1983)); *see also Remington Lodging*, 847 F.3d at 186 & n.22 (noting that we will "not lightly displace the Board's factual finding of discriminatory intent" (quoting *Brookwood*, 701 F.2d at 464)).

### A.    Ramirez's engagement in protected activities

According to the Board's findings, Ramirez engaged in protected activities by (1) discussing issues relating to his wages with his coworkers, (2) requesting to access his personnel records, and (3) filing the FLSA collective action lawsuit against Cordúa. On review, Cordúa argues that the Board "erred by finding that Ramirez's attempt to acquire other employees' payroll information, without their permission, and lying to the COO about it, was protected activity." The Board did not in fact make such a finding.

Cordúa does not dispute the Board's findings that Ramirez engaged in protected activities by discussing payroll-related issues with his coworkers, filing the collective action lawsuit, or requesting to access his *own* personnel records. Cordúa has thus waived these issues. *See Flex Frac Logistics, L.L.C. v. NLRB*, 746 F.3d 205, 208 (5th Cir. 2014).

### B. Cordúa's knowledge of and animus toward Ramirez's protected conduct

Cordúa also does not dispute, and has thus waived any argument against, the Board's finding that Ambroa and Espinoza each had knowledge of Ramirez's protected conduct. *Id.* In order to round out the *Wright Line* framework and conclude on review that Ramirez's firing violated Section 8(a)(1), we must find substantial evidence to support that Cordúa harbored animus toward Ramirez's protected activities. *Remington Lodging*, 363 NLRB 112, at *2 & n.5.

Cordúa argues that, as a preliminary matter, the Board "failed to make a finding regarding animus" because the Board "may not rest its entire decision that animus motivated an employee's discipline on a finding that the employer gave a pretextual reason for its action." Cordúa relies primarily on *Valmont*, in which the ALJ based its entire animus finding on its determination that the employer gave a pretextual reason for disciplining employees. *Valmont Indus., Inc.*, 244 F.3d 454, 466 (5th Cir. 2001). Here, the Board expressly incorporated the ALJ's finding that Cordúa exhibited animus toward Ramirez's protected conduct through Espinoza's questioning of Ramirez and the course of Cordúa's investigation. Although these facts are closely tied to the Board's separate finding of pretext, they also lend independent support to the Board's animus finding. Importantly, although relying on the same sets of facts to support the animus and pretext findings, the ALJ did not find animus solely because Cordúa gave a pretextual reason for firing Ramirez. Rather, the ALJ found that the same set of facts demonstrated animus and pretext.

We now turn to the merits of the Board's animus finding. On review, the Board maintains that substantial evidence supports its finding of animus, pointing to (1) Ambroa's surveillance and Espinoza's interrogation of Ramirez, (2) the circumstances of Cordúa's investigation, and (3) Cordúa's

pretextual justifications for firing Ramirez. Cordúa makes various arguments against the Board's finding. We discuss these arguments in turn.

1.    Cordúa's surveillance and questioning of Ramirez

Substantial evidence supports the Board's finding that Cordúa exhibited overt animus in its surveillance and questioning of Ramirez. Ambroa intentionally accessed Reichman's personal cellphone, opened Reichman's text conversation with Ramirez, scrolled through the texts, and photographed the conversation. Although, according to Ambroa's testimony, Reichman had granted him general permission to access her personal cellphone to make calls, Ambroa did not provide a credible reason for reading, photographing, and forwarding Reichman's private text messages. Ambroa claimed that he opened Reichman's text conversation with Ramirez because he saw on the preview screen that two messages "were mentioning [his name]." However, the only message in Reichman and Ramirez's conversation mentioning Ambroa's name was not a recent message (the most recent text messages in the thread concerned an unrelated scheduling issue) and was too long for Ambroa's name to have appeared on the preview screen.

The record indicates that after learning of Ramirez's involvement in the collective action lawsuit, Ambroa singled out a text conversation between Ramirez and Reichman in which they appeared to be discussing wage-related issues, photographed the exchange, and sent the photographs to Cordúa's chief operating officer. We have previously found that illicit surveillance of protected conduct "indicates an employer's opposition to [that conduct], and the furtive nature of the snooping tends to demonstrate spectacularly the state of the employer's anxiety." *Hendrix Mfg. Co. v. NLRB*, 321 F.2d 100, 104 n.7 (5th Cir. 1963).

Cordúa argues that surveillance is not unlawful absent "accompanying interference, coercion, or restraint of Ramirez's protected rights." Here, though, the surveillance *did* interfere with protected rights, as it was used by Cordúa to gain general information about Ramirez's collective action-related conversations with Reichman.

Cordúa further displayed animus through Espinoza's questioning of Ramirez. This questioning extended beyond the purported objective of determining whether Ramirez sought confidential information. As the Board found, Espinoza's questioning was coercive, asking Ramirez to generally assert that he had never texted Reichman about non-scheduling issues. Espinoza pressured Ramirez to grant Cordúa access to his personal cellphone and consistently denied Ramirez's repeated requests to call his attorney. The Board has previously found animus where an employer coercively questioned employees about their visit to an attorney's office to discuss a possible wage-and-hour lawsuit. *Delta Gas, Inc.*, 282 NLRB 1315, 1315 n.1, 1317, 1322–23 (1987).

Cordúa next asserts that because the Board had the opportunity to ask Reichman whether Cordúa harbored animus toward the FLSA collective action and chose not to, Cordúa is entitled to an inference that this evidence would weigh against the Board's finding of animus. This argument is also meritless. Cordua cites *Elite Ambulance*, but that case specifies that the potential evidence must be relevant evidence within the party's control to have bearing. *See Elite Ambulance Inc. & Int'l Ass'n of Emts & Paramedics Local 5000*, 31-CA-122353, 2015 WL 9459716 (N.L.R.B. Div. of Judges Dec. 23, 2015), *adopted sub nom. Elite Ambulance, Inc. & Int'l Ass'n of Emts & Paramedics Local 5000*, S 31-CA-122353, 31-C, 2016 WL 453585 (N.L.R.B. Feb. 4, 2016); *see also Herbert v. Wal-Mart Stores, Inc.*, 911 F.2d 1044, 1046 (5th Cir. 1990) (explaining that the adverse witness rule applies where "a party has it peculiarly within his power to produce witnesses whose

testimony would elucidate the transaction [at issue]."). Cordúa does not explain why Reichman's personal assessment of whether Cordúa harbored animus would be relevant to the Board's finding.

### 2.     The circumstances of Cordúa's investigation

The Board next found, and maintains on review, that the timing of Cordúa's investigation, Cordúa's internally inconsistent response to Ramirez's purported misconduct, and Cordúa's failure to conduct a meaningful investigation support an inference of discriminatory motive. Substantial evidence supports these findings.

The timing of an employer's actions in relation to an employee's protected activity and the employer's knowledge thereof is a "[s]ignificant indicator" of unlawful motive. *NLRB v. ADCO Elec., Inc.*, 6 F.3d 1110, 1118 n.6 (5th Cir. 1993); *see also Valmont*, 244 F.3d at 465 (describing proximity in time as the "strongest form of circumstantial evidence"). Cordúa began its surveillance of Ramirez just several weeks after its managers were informed of the collective action lawsuit. Ramirez was fired the week after a nineteenth employee joined the collective action lawsuit.

Cordúa counters that because Ramirez was terminated eight months after he filed his NLRB complaint, this "negat[es] any inference of unlawful motivation." In support of this contention, Cordúa cites cases finding that a multi-month gap in time between an employee's protected activities and their termination did not support an inference of unlawful motive. These cases, and Cordúa's argument, are inapposite. Cordúa investigated and fired Ramirez just weeks after its management learned of Ramirez's involvement in the lawsuit and of Ramirez's wage-related conversation with Reichman. Ramirez's protected activities—participating in the FLSA lawsuit, discussing wage issues with co-workers, and requesting his payroll information—were ongoing and occurred close in time to the investigation

and termination. The timing of Cordúa's actions thus weighs in favor of the Board's discriminatory motive finding.

Cordúa's internally inconsistent response to Ramirez's purported misconduct also supports an inference of discriminatory motive. As the Board found, Cordúa's asserted concerns about Ramirez's fitness and trustworthiness as an employee, particularly with respect to handling confidential credit card information, are undermined by Cordúa's failure to speak with Ramirez about these concerns for nearly six weeks. The Board may rely on "inconsistencies between the employer's proffered reason for the discipline and other actions of that employer" as evidence of animus and unlawful motivation. *Tellepsen Pipeline Servs. Co. v. NLRB*, 320 F.3d 554, 565 (5th Cir. 2003) (quoting *Valmont Indus.*, 244 F.3d at 456).

The record also supports that Cordúa failed to conduct a meaningful investigation of Ramirez. Although Cordúa asserted that the investigation was meant to determine whether Ramirez attempted to access confidential personnel files, Cordúa merely asked IT whether any records had been removed, and then, weeks after IT reported that it was "more likely than not" that no records had been taken, questioned Ramirez. Nor do the two meetings between Espinoza and Ramirez reflect a genuine intent to determine whether Ramirez tried to obtain other employees' confidential records. Espinoza's questioning of Ramirez was not tailored to this purpose, and Espinoza was coercive in pressuring Ramirez to provide access to his personal cellphone and denying Ramirez's requests to speak to his lawyer. An employer's one-sided or faulty investigation into an employee's purported misconduct may constitute "significant" evidence of unlawful motive. *NLRB v. Esco Elevators*, 736 F.2d 295, 299 n.5 (5th Cir. 1984); *accord Valmont Indus.*, 244 F.3d at 466–67.

3.    Cordúa's pretextual justifications for Ramirez's termination

Finally, the Board maintains that "it is well established that the Board's finding of unlawful motive is reinforced where some or all of the employer's proffered explanations for its actions are found to be pretextual." As we discuss in the next section, the record supports that Cordúa's purported reasons for firing Ramirez were pretextual.

**C.    Cordúa's affirmative defense**

Substantial evidence supports the Board's findings that (i) Ramirez engaged in protected activities, (ii) Cordúa had knowledge of Ramirez's protected conduct, and (iii) Cordúa harbored animus toward these activities. Cordúa may only negate that Ramirez's termination violated Section 8(a)(1) by establishing, as an affirmative defense, that Cordúa would have fired Ramirez even if he had not engaged in protected conduct. *See Transp. Mgmt.*, 462 U.S. at 401–02; *Delta Gas*, 840 F.2d at 313. The Board may counter Cordúa's defense by showing that Cordúa's purported reasons for firing Ramirez were pretextual. *See Golden State Foods Corp.*, 340 NLRB 382, 385 (2003) (noting that if an employer's stated justifications are found to be pretextual, "that is, either false or not in fact relied upon," the employer "fails by definition" to carry its burden).

The Board found that Cordúa failed to show that it would have discharged Ramirez even in the absence of his protected conduct because "its claimed reason for discharging Ramirez—dishonesty—was pretextual." Cordúa again argues on appeal that Ramirez either accessed or attempted to access other employees' confidential records and lied about this attempt to Espinoza. Cordúa urges us to credit Reichman's text messages to Ambroa, which stated that "Steven asked me if I can get other of [sic] peoples payrolls" but that she "didn't take anything for Steven" and did not "want anything to do with what he was doing because I didn't feel it was right."

17

Cordúa argues that Ramirez's contravening testimony should not be credited because he committed "perjury."

The Board discredited Reichman's text message to Ambroa asserting that Ramirez had asked her to obtain other employees' confidential records because this statement was not corroborated by the actual text message conversation between Reichman and Ramirez. The Board adopted the ALJ's reasoning, which credited Ramirez's "reluctant admission" in testimony that he only asked Reichman to obtain his own payroll records, to which he was entitled pursuant to Cordúa's employee handbook. The Board further discredited Cordúa's contention that Ramirez lied to Espinoza because Espinoza's questions during his meeting with Ramirez were misleading.

We give special deference to the Board's credibility determinations, upholding such determinations unless they are "inherently unreasonable or self-contradictory." *El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 665 (5th Cir. 2012); *see also NLRB v. Cal-Maine Farms, Inc.*, 998 F.2d 1336, 1339–40 (5th Cir. 1993); *IBEW, AFL-CIO, CLC, Local Unions 605 & 985 v. NLRB*, 973 F.3d 451, 457 (5th Cir. 2020).

As the Board noted, the text exchange between Reichman and Ramirez does not contain any request to obtain other employees' personnel information. Though both Ambroa and Espinoza testified that the text message exchange between Reichman and Ramirez meant that Ramirez had asked Reichman to obtain other employees' confidential information, both merely speculated as to the meaning of the texts and explained what they inferred after reading the texts. "Suspicion, conjecture, and theoretical speculation register no weight on the substantial evidence scale." *DISH Network Corp. v. NLRB*, 953 F.3d 370, 378 (5th Cir. 2020) (quoting *NLRB v. Mini-Togs, Inc.*, 980 F.2d 1027, 1032 (5th Cir. 1993)); *see also Ernst & Young*, 304 NLRB 178, 179 (1991) (declining to rely on speculative testimony in a

compliance hearing); *DSL Mfg. Inc.*, 202 NLRB 970, 971 (1973) ("[S]peculation does not amount to evidence").

Neither Ambroa nor Espinoza ever contacted Reichman regarding the statements made in her text messages, lending support to the Board's finding that Reichman's text message statements to Ambroa about Ramirez seeking other persons' records are not credible. Because the Board's credibility determination here is not inherently unreasonable or self-contradictory, we defer to the Board.

The Board's credibility determination as to Ramirez's testimony that he only sought to obtain his own payroll records is also not inherently unreasonable or self-contradictory. On review, Cordúa argues that Ramirez's testimony is not credible because he "demonstrated his dishonesty and willingness to commit perjury multiple times." In support, Cordúa invokes Ramirez's testimony that he told Espinoza "truthful answers" concerning his texts with Reichman compared to his later admission that he texted Reichman about non-scheduling matters when he sent her his start date with Cordúa. Cordúa also points to Ramirez's testimony that Espinoza asked him for the names of coworkers involved in the lawsuit during their meeting compared with the meeting transcript which does not support this assertion.

We agree with the Board that this testimony does not undermine Ramirez's credibility as a witness. Inconsistencies or conflicts in a witness's testimony, standing alone, are insufficient to establish perjury. *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990); *see also Fairfax v. Scott*, No. 93-8853, 1994 U.S. App. LEXIS 42267, at *3 (5th Cir. 1994) (per curiam) (unpublished). Neither of the allegedly contradictory testimonial statements relates to Ramirez's testimony that he only asked Reichman to obtain his own payroll records. Moreover, the only evidence Cordúa cites to show that Ramirez attempted to obtain other employees' confidential records—

No. 19-60630

Reichman's text messages to Ambroa and the testimonies of Ambroa and Espinoza—were deemed not credible and speculative, respectively. The Board's reliance on Ramirez's testimony was not inherently unreasonable or self-contradictory.[4]

The record supports that Cordúa's claim to have fired Ramirez for accessing other employees' confidential records was pretextual. Cordúa never received any information establishing that Ramirez obtained other employees' records. The IT department's investigation, concluded weeks before Ramirez's firing, determined that it was "more than likely" that no records had been taken.[5] Cordúa's claim to have fired Ramirez for *attempting* to obtain other employees' confidential records was also pretextual. Substantial evidence supports the Board's finding that Cordúa had no credible evidence supporting that Ramirez attempted to access other employees' records.

Ramirez's alleged dishonesty to Espinoza was also a pretextual justification for his termination. Espinoza's questions to Ramirez were

---

[4] Cordúa also argues, citing *Valmont Industries, Inc. v. NLRB*, 244 F.3d 454, 465–66 (5th Cir. 2001), that the Board gave inconsistent treatment to the same piece of evidence by disregarding Ramirez's earlier testimony that he gave Espinoza only truthful answers but relying on this testimony for Ramirez's assertion that he did not ask Reichman to access other employees' confidential records. We find *Valmont* distinguishable on this point. In *Valmont*, the ALJ treated the same testimonial statement inconsistently. *See id.* Here, the Board carefully acknowledged that some of Ramirez's testimony may have reflected minor lapses in memory and instead relied on other, unrelated parts of Ramirez's testimony.

[5] Cordúa avers that, in the proceeding below, the Board did not in fact make a finding that Cordúa fired Ramirez for allegedly obtaining other employees' personnel records. Cordúa argues that we therefore lack jurisdiction to consider this argument on review. This argument misreads the Board's supplemental decision and order. The Board's supplemental decision explicitly incorporated "the reasons stated by the [ALJ]" in finding that Cordúa "failed to show that it would have discharged Ramirez for legitimate reasons even in the absence of his protected concerted activities because its claimed reason for discharging Ramirez—dishonesty—was pretextual."

misleading. Ramirez could have reasonably interpreted Espinoza's question about whether he had texted Reichman about "getting any records" to refer solely to obtaining other employees' records, because Ramirez was entitled to access his own records. Ramirez answered Espinoza's question as to whether there were any text messages "to [Reichman] about a flash drive" accurately, because only Reichman sent text messages about a flash drive. Further, Ramirez's general statements to Espinoza that he only texted Reichman about scheduling issues do not implicate the substantial evidence cited by the Board as to Ramirez's protected activity. Finally, we have observed that an employer cannot avoid liability by pointing to evasive statements by an employee in response to questioning "inextricably involved" with the employee's protected conduct. *NLRB v. Roney Plaza Apartments*, 597 F.2d 1046, 1051 (5th Cir. 1979). Substantial evidence supports the Board's finding that Cordúa's purported reasons for firing Ramirez were pretextual, and Cordúa has thus failed to establish that it would have fired Ramirez absent his engagement in protected conduct.

### D.     The Board's order directing Cordúa to offer Ramirez full reinstatement and backpay

The Board ordered Cordúa to remedy its Section 8(a)(1) violation by (1) offering Ramirez full reinstatement to his former job or a substantially equivalent position, (2) making Ramirez whole for any lost earnings or benefits, (3) compensating Ramirez for any adverse tax consequences of receiving a lump-sum backpay award, and (4) removing any reference to Ramirez's termination from its files. On review, Cordúa argues that the Board erred in ordering reinstatement and backpay because Ramirez "committed misconduct and perjured himself." As established, the record does not support Cordúa's allegations that Ramirez committed misconduct or perjury. We give the "greatest deference" to the Board's choice of remedy and will not reverse this decision unless it is shown to be a "patent attempt

No. 19-60630

to achieve ends other than those which can fairly be said to effectuate the policies of the NLRA." *In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707, 720 n.7 (5th Cir. 2018) (internal quotation marks and citation omitted). Cordúa has not met this high bar.

## V.

For the foregoing reasons, we AFFIRM the NLRB's decision, ENFORCE the order, and DENY Cordúa's petition for review.