# United States Court of Appeals for the Fifth Circuit

———————

No. 23-60513

———————

United States Court of Appeals
Fifth Circuit

**FILED**

November 25, 2024

Lyle W. Cayce
Clerk

CAPSTONE LOGISTICS, L.L.C.,

*Petitioner/Cross-Respondent*,

*versus*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner*.

———————————————————

Petition for Review of an Order of the National Labor Relations Board
Agency Nos. 15-CA-257443,
15-CA-259712

———————————————————

Before SOUTHWICK, HAYNES, and DOUGLAS, *Circuit Judges*.

DANA M. DOUGLAS, *Circuit Judge*:

Capstone Logistics, LLC ("Capstone") petitions for review of a National Labor Relations Board ("NLRB" or "the Board") decision and order determining that Capstone violated the National Labor Relations Act ("NLRA") by firing an employee for engaging in protected concerted activity or, alternatively, because it believed she had engaged in protected concerted activity. The Board opposes Capstone's petition and cross-petitions for summary enforcement of its order. Because we determine that the decision of the NLRB was, in part, supported by substantial evidence, we DENY Capstone's petition for review and ENFORCE the order.

No. 23-60513

# I.

Capstone is a nationwide company that provides labor to other businesses, including Associated Wholesale Grocers at its facilities. In the fall of 2019, Capstone began supplying personnel to work as auditors at Associated Wholesale Grocers' food distribution warehouse in Pearl River, Louisiana. Using scan guns, the auditors checked groceries that had been loaded onto pallets on various docks, including the cold dock for perishables, to ensure that Associated Wholesale Grocers accurately fulfilled its customers' orders. The auditors' job also required them to spend some time inside of freezers at the facility. Associated Wholesale Grocers provided its employees with freezer suits to withstand the cold temperatures, but Capstone did not supply its auditors with such suits. After verifying the customers' orders were correctly filled, the auditors then rewrapped the orders and rebuilt the pallets.

Capstone initially told the Pearl River auditors that they would be paid hourly during their training and would receive production pay—at sixteen cents per case scanned—after their training. But in the nine months or so that Capstone provided auditors to Associated Wholesale Grocers at its Pearl River facility, its auditors were only ever paid an hourly wage.

## A.

In September 2019, Capstone hired Joyce Henson to serve as lead auditor at the Pearl River facility. During her one-month tenure, Henson spoke to the other Capstone auditors, as well as Capstone and Associated Wholesale Grocers personnel, about a variety of work-related matters. The auditors expressed concerns related to safety and training, the need for warm clothing to withstand cold temperatures, and the rate of pay. Henson also spoke separately with Associated Wholesale Grocers and Capstone officials about her own pay as lead auditor.

On either October 17 or 18, Prince Wilson, a Capstone manager who trained the auditors at the Pearl River facility, brought Henson and the other

2

auditors to a meeting with Associated Wholesale Grocers' Director of Distribution Chris Griffin and Senior Manager Ryan Carroll.  At the meeting, Henson raised the auditors' concerns about the safety of the location in which they would be working, their need for freezer suits, and their pay.  As Henson spoke on their behalf, the other auditors nodded their heads in agreement.  Griffin told Henson that he would discuss these matters with Capstone.

At the end of the meeting, after the other auditors had left, Henson spoke privately with Griffin and Carroll to raise concerns about her own pay.  Henson also mentioned that she had contacted Donny Rouse, the owner of a grocery chain that was a major Associated Wholesale Grocers customer, and who happened to be a friend of Henson's stepfather.[1]  Griffin expressed surprise that Henson knew Rouse and told her to contact Capstone's Vice President of Operations Tim Casey and Director of Operations Mike Ruder.

Griffin told Casey about his meeting with Henson and the other Capstone auditors.  He expressed annoyance that the auditors came to him directly instead of their own managers about Capstone-related matters.  Griffin also complained that Henson did not know who to report to, and he told Casey about Henson's relationship with Donny Rouse.  Casey assured Griffin that he would take care of it.

Several days later, at about noon on October 22, Henson and the other auditors met with Capstone officials Casey and Ruder, along with Andrew Powell, who at the time of the meeting was Capstone's site manager in Kansas City and would later succeed Ruder as Capstone's Director of

---

[1] In a LinkedIn message sent from Henson to Rouse on October 16, Henson asked Rouse for his "help" with her pay.  Henson informed Rouse that she was initially told by Capstone told that she would make $175 to $200 per day at sixteen cents per case, but she was recently informed by Capstone's floor supervisor that she would only make $11.75 per hour instead.  After telling Rouse that she "can't continue this [job] for [$]11.75/hr," Henson asked Rouse to "put in a call for [her]."  The following day, Rouse responded to Henson's message, stating, "no problem, I will look into it."

Operations for Pearl River.  During the meeting, Henson raised the concerns about the safety of the area in which the auditors were being trained.  Powell indicated that this was a problem at another Associated Wholesale Grocers' location and that he had been able to rectify the issue.  Henson also claimed that Prince Wilson, the individual who trained the auditors, was unqualified to do so, but Casey disagreed.  Other auditors also raised concerns during the meeting about their training and safety.  When Henson asked about freezer suits for the auditors, Casey responded that Capstone was only required to provide its employees with gloves and vests.  Henson also raised the issue of compensation, stating that the auditors had been told they would make sixteen cents per case scanned and arguing that the production pay system was flawed.  Casey remarked that the auditors would be paid only eight or nine cents per case.

After the meeting with the other auditors, Henson spoke separately with Casey, Ruder, and Powell.  She specifically raised concerns about her own pay to the Capstone officials, complaining that she had been told that she would make $200 per day as lead auditor.[2]  Casey indicated that Capstone would investigate it and that she would get what was due.  Casey also told Henson that if she had any concerns, she should bring them only to him or Ruder, and specifically asked her not to go to Associated Wholesale Grocers with any Capstone-related issues or concerns.

Following these meetings, Henson sent a LinkedIn message to Donny Rouse.  The message, which Henson sent to Rouse at 2:43 p.m. on October 22, concerned her pay and the pay of her fellow auditors, and it implicitly asked Rouse to intervene with Associated Wholesale Grocers officials Griffin and Carroll on the auditors' behalf.  It read:

---

[2] Henson's pay stubs reflect that prior to the October 22 meeting, she had been paid on an hourly basis at a rate of $10 per hour.

This is by far the worst company I have ever worked for. Do you ever come to slidell? Would you like to have lunch with me and we talk about everything and I'll treat you!!! I really need your opinion and feed back. I'm really trying to stick it out. Today at 12:00 pm we had a meeting with capstone management. They told my auditors that they was misinformed and they will only make $0.09 per case not $0.16. I have not been given a amount that I will make. As of right now I'm only making 10.00 hr and This is week 3.

I would love to talk anytime . . . and answer any questions you might have. The guy that runs things for [Associated Wholesale Grocers] is Chris griffin and Ryan Carroll their number is [###-###-####].

Later that same day, Griffin and Henson briefly interacted on the loading dock of the Pearl River facility. Afterwards, Griffin had a one-minute conversation with Casey over the phone, purportedly about Henson. Casey testified that he decided to terminate Henson's employment after speaking with Griffin.

The next morning, Casey told Ruder that he intended to fire Henson because she "had gone to the partner with some concerns" after being told to "voice her concerns to Capstone [ ] and not the partner,"[3] thereby "violat[ing] proper communication." Casey then telephoned Henson and informed her of her termination because of what had transpired the day before and for disrupting Capstone's relationship with Associated Wholesale Grocers. Casey did not ask Henson what had transpired during her conversation with Griffin on October 22.

Henson subsequently contacted Capstone's Human Resources Department several times about her discharge. On November 6, Casey left a

---

[3] Capstone refers to its customers, including Associated Wholesale Grocers, as its partners. In testimony, Casey has referred to Associated Wholesale Grocers' Chris Griffin as "the partner."

voicemail for Henson in which he stated that the reason for her termination was the "disruption of business" caused by Henson "questioning the partner" despite his directive from the day before that Henson should come directly to him if she had any questions or issues.

Casey testified that Associated Wholesale Grocers personnel never asked or instructed Capstone to terminate Henson and had no input in the decision to fire her, and that he alone made the decision to fire Henson. Capstone did not provide Henson with any documentation regarding her termination nor any other explanation than the voicemail message above.

## B.

Acting on charges filed by Henson, the Board's General Counsel issued a complaint against Capstone, alleging violations of Section 8(a)(1) of the NLRA by discharging Henson because she engaged in protected concerted activity and by informing Henson that she had been fired for that protected concerted activity. After a hearing, the administrative law judge ("ALJ") dismissed both allegations.

Specifically, the ALJ found that Henson engaged in protected concerted activity by "concertedly complain[ing] about the safety of the area in which new auditors were trained." It also credited Henson's testimony "that she raised concerted concerns regarding the production or piecework rate at which the new auditors were to be paid after completing their training." Moreover, the ALJ determined that Capstone was aware, through Prince Wilson, of Henson's safety and compensation complaints. But the ALJ concluded that there was "no evidence of animus towards Henson's protected activities prior to October 22 and 23." And although the ALJ found that there was evidence of animus towards Henson by Capstone and Associated Wholesale Grocers on October 22 and 23, it determined that the General Counsel had failed to "establish[] that this animus was due to her

protected activities." Instead, the ALJ concluded that "[t]he record [was] equally consistent with animus confined to her unprotected activities"—namely, her efforts to secure better compensation for herself, not other employees. The ALJ reasoned that Henson's testimony and her October 22 message to Donny Rouse both indicated that she was primarily concerned with her own pay and not that of her fellow auditors.

The ALJ further determined that it was "clear that something transpired between Henson and [Associated Wholesale Grocers'] Chris Griffin on October 22, that led Griffin to call Tim Casey to tell him Henson should not be allowed back in the Pearl River facility." The ALJ inferred that Griffin had learned of Henson's LinkedIn message to Donny Rouse, after which Griffin approached Henson on the loading dock at the Pearl River facility. While Henson testified that Griffin had asked her how her meeting with Casey, Ruder, and Powell went, and that she made no complaints about wages or working conditions to Griffin, the ALJ determined that there was "no reliable evidence in [the] record as to what transpired between Griffin and Henson."[4] However, the ALJ concluded that whatever transpired between the two ultimately led to Henson's termination the following day.

The ALJ noted that Griffin had sent a text message to Casey at 2:58 p.m. asking Casey to call him,[5] which the ALJ inferred was sent almost immediately after Griffin spoke to Henson on the loading dock. Minutes later, Casey called Griffin and the two men spoke for about one minute at 3:01 p.m. Although Casey testified about what he and Griffin discussed during

---

[4] The ALJ concluded that the testimony regarding what transpired between Griffin and Henson was hearsay and declined to credit it.

[5] The time stamp shown on Griffin's text message is 3:58 p.m.; however, Casey testified that because he is based in Atlanta, Georgia, the timestamp is in Eastern Standard Time, meaning that the message was sent at 2:58 p.m. Central Time.

the phone call,[6] the ALJ found that there was "no reliable evidence as to what was said by either one" because Casey's testimony—the only testimony on the conversation—was "too self-serving in the context of this record to be credible." But the ALJ inferred that "Griffin may have been reacting to a communication from [Donny] Rouse," and concluded that Casey "decided to terminate Henson after talking to Griffin."

Next, the ALJ determined that the General Counsel failed to establish a sufficient causal connection between Henson's protected concerted activities and her termination. The ALJ reasoned that while Henson's discharge was "clearly connected to her interaction with Chris Griffin on October 22," the General Counsel did not show that this communication "concerned her protected activities as opposed to her desire to put pressure on [Capstone and Associated Wholesale Grocers] to increase her own compensation." The ALJ also found that although the timing between Henson's meeting with Capstone and her subsequent discharge might otherwise suggest a discriminatory motive, such was not the case here given the lack of evidence connecting Capstone's "animus towards Henson's protected activity, and the intervening event, i.e., Henson's interaction with Griffin."

Finally, the ALJ rejected the allegation that Capstone violated Section 8(a)(1) when Casey told Henson that she was terminated for engaging in protected activities. The ALJ reasoned that Casey's statements regarding the reason for Henson's termination—that she had disrupted business by "questioning the partner"—"clearly relate[d] to Henson's

---

[6] Casey testified that Griffin was "upset and excited," and his voice was raised during the call, and that Griffin had told him that Henson had interrupted him while he was speaking with his associates. Casey further testified that Griffin described Henson as "unprofessional" and "rude" during the encounter.

encounter with Griffin on October 22." Because the ALJ found no evidence that Henson engaged in protected activity during her encounter with Griffin, it concluded that Casey's statements did "not mean that he was terminating [Henson] for protected activity."

Both the General Counsel and Henson filed exceptions before the Board, and Capstone filed cross-exceptions. The Board reversed the ALJ's conclusion that Capstone did not violate Section 8(a)(1) of the NLRA by discharging Henson. It found two rationales for finding that Henson's discharge violated the Act: (1) that she was discharged for engaging in protected concerted activity when she sent the LinkedIn message to Rouse to enlist his support for an employee compensation matter, and (2) that she was discharged because Capstone believed she engaged in protected concerted activity during her conversation with Griffin on October 22. The Board further reversed the ALJ's finding that Capstone did not violate Section 8(a)(1) by informing Henson of the reason for her discharge.

Capstone then filed the instant petition with this court. The Board cross-appealed for enforcement of its order.

## II.

We review the Board's findings of fact under a substantial-evidence standard. *Sara Lee Bakery Grp., Inc. v. NLRB*, 514 F.3d 422, 428 (5th Cir. 2008). Under 29 U.S.C. § 160(e), the Board's findings of fact are "conclusive" if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *accord Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *Cordua Rest., Inc. v. NLRB*, 985 F.3d 415, 422 (5th Cir. 2021). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera*, 340 U.S. at 477; *Flex Frac Logistics, LLC v. NLRB*, 746 F.3d 205, 207 (5th Cir. 2014). "It is more than a mere scintilla, and less than

a preponderance." *IBEW, AFLCIO, CLC, Loc. Unions 605 & 985 v. NLRB*, 973 F.3d 451, 457 (5th Cir. 2020) (quoting *Creative Vision Res., LLC v. NLRB*, 882 F.3d 510, 515 (5th Cir. 2018) (internal quotation marks omitted)).  Under this standard, a reviewing court may not "displace the Board's choice between two fairly conflicting views, even though the court [may] justifiably have made a different choice had the mater been before it *de novo*." *Universal Camera*, 340 U.S. at 488; *accord El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 656–57 (5th Cir. 2012).  Our deference "extends to [our] review of both the Board's findings of fact and its application of law."  *J. Vallery Elec., Inc. v. NLRB*, 337 F.3d 446, 450 (5th Cir. 2003).

## III.

Section 7 of the NLRA guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."  National Labor Relations Act § 7, 29 U.S.C. § 157.  Section 8(a)(1) safeguards those rights by making it an "unfair labor practice" for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7]."  *Id.* § 158(a)(1).  Relevant here, an employer violates Section 8(a)(1) by discharging an employee for engaging in protected concerted activities within the meaning of Section 7, or because it believes the employee engaged in such activity.  *See Remington Lodging & Hosp., LLC v. NLRB*, 847 F.3d 180, 185–86 (5th Cir. 2017) (noting that Sections 7 and 8(a)(1) of the NLRA protect both actual and "alleged" [protected] activities, such that it is "sufficient if the employer was motivated by suspected [protected] activity in discharging the employee" (quoting *Holyoke Visiting Nurses Ass'n v. NLRB*, 11 F.3d 302, 307 (1st Cir. 1993) (internal quotation marks omitted))); *see also JCR Hotel, Inc. v. NLRB*, 342 F.3d 837, 839 (8th Cir. 2003) (holding that § 8(a)(1) prohibits

an employer from discharging an employee for conduct the employer believes to be protected concerted activity); *Saffels v. Rice*, 40 F.3d 1546, 1549 (8th Cir. 1994) (collecting cases in which courts have held that the NLRA protects employees who "did not actually engage in" protected activity when the employer mistakenly believes that they engaged in such protected activity); *Henning & Cheadle, Inc. v. NLRB*, 522 F.2d 1050, 1052 (7th Cir. 1975) (holding that the NLRA is violated if an employer acts against his employees in the belief that they have engaged in protected activities, whether or not they actually did so).

We find insufficient evidence in the record to support the Board's finding that Capstone unlawfully discharged Henson for engaging in protected concerted activity when she sent the October 22 LinkedIn message to Donny Rouse.[7] Nevertheless, we affirm the Board on its alternative determination that Capstone violated Section 8(a)(1) of the NLRA by discharging Henson because it believed she had engaged in protected concerted activity.[8]

## A.

The Board first determined that Capstone violated the NLRA when it discharged Henson because of her protected concerted activity. Specifically, it found that Henson engaged in protected concerted activity by sending the LinkedIn message to Donny Rouse on October 22 "in an effort

---

[7] We therefore decline to consider Capstone's argument that the Board erred in concluding that the *Wright Line* analysis was unnecessary or, alternatively, that the Board misapplied *Wright Line*.

[8] Because we find that Capstone unlawfully discharged Henson, we need not reach Capstone's argument that the Board erred in finding that Capstone told Henson she was fired for an unlawful reason. As Capstone acknowledges in its brief, its argument rests upon a finding that Henson's discharge was not unlawful.

to enlist Rouse's support in asking [Associated Wholesale Grocers] to intervene with Capstone on the employees' behalf concerning their pay." The Board then concluded that although there was "no direct evidence" that Capstone Vice President Casey knew about Henson's LinkedIn message to Rouse when he decided to fire her, the record warranted an inference of such knowledge. In reaching this conclusion, the Board relied on the assertion that "knowledge of an employee's protected activity may be proven by circumstantial evidence from which a reasonable inference may be drawn." For circumstantial evidence, the Board pointed to: (1) the ALJ's unexcepted finding that Henson engaged in protected concerned activity during the October 22 group meeting with Casey; (2) Griffin's prior complaint to Casey that Henson and the other auditors had approached him about Capstone-related issues, and Casey's subsequent assurance to Griffin that he would take care of this problem; (3) Casey's knowledge of Henson's relationship with Rouse; (4) the ALJ's unexcepted inference that Griffin knew about the LinkedIn message when he approached Henson on the loading dock; and (5) Casey's decision to fire Henson immediately after speaking to Griffin. Based upon these findings and inferences, coupled with the sequence of events following Henson's LinkedIn message, the Board determined that there was "compelling circumstantial evidence that Griffin told Casey about Henson's October 22 LinkedIn message prior to Casey's decision to discharge Henson," and that Casey's knowledge of the LinkedIn message was the basis for Henson's termination.

Substantial evidence does not support the Board's illative conclusion. Even assuming Henson engaged in protected concerted activity when she sent the LinkedIn message to Rouse, we find insufficient evidence in the record to support the Board's inference that Casey knew of the message when he terminated Henson's employment. In reaching this inference, the Board speculated that Griffin learned about Henson's LinkedIn message and

relayed this information to Casey during their one-minute phone call. But only fifteen minutes separates the time that Henson sent Rouse the message at 2:43 p.m. from the time that Griffin asked Casey to call him at 2:58 p.m. And nothing in the record substantiates whether Rouse ever read Henson's message or contacted Griffin about it. Thus, the Board's conclusion required it to make a series of inferential leaps: (1) that after Henson sent Rouse the LinkedIn message, Rouse almost immediately read the message and contacted Griffin about it; (2) that Griffin then approached Henson on the loading dock about her message; and (3) that Griffin subsequently relayed to Casey the information about Henson's LinkedIn message when they spoke on the phone—all of which must have transpired in less than twenty minutes. Such a speculative chain of events does not offer substantial circumstantial evidence that Casey knew about the LinkedIn message before terminating Henson, nor does it give rise to a reasonable inference of such knowledge. *See Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 639 (5th Cir. 2003) (noting that although a finding of a violation "may be supported through circumstantial, rather than direct evidence, . . . [t]hat evidence . . . must be substantial, not speculative, nor derived from inferences upon inferences"); *cf. Berry Sch. v. NLRB*, 627 F.2d 692, 704 (5th Cir. 1980) (determining that "inferences about events which might have happened" were "speculations unsupported by the evidence").

The court notes that because neither party excepted to the ALJ's inference that Griffin knew about Henson's LinkedIn message before approaching her, the Board accepted this finding as true, and we must do the same.[9] *See Detroit Edison Co. v. NLRB*, 440 U.S. 301, 311–12 n.10 (1979). But

_____

[9] Capstone asserts that it "did not except to the ALJ's conclusion on this point because it was irrelevant to the ALJ's decision." Although Capstone concedes that it is

this inference, by itself,[10] is not sufficient to infer Casey's knowledge. Even assuming that Griffin learned of the LinkedIn message within the short fifteen-minute window after Henson sent it, there is no evidence—direct or circumstantial—that Griffin mentioned the message either to Henson during their October 22 interaction or to Casey when he talked with him on the phone shortly thereafter. Indeed, neither Henson nor Casey testified to having any discussion of the LinkedIn message with Griffin. And none of the other circumstantial evidence identified by the Board lends support to the inference that Griffin specifically told Casey about the LinkedIn message during their one-minute phone call. Thus, the ALJ's unexcepted inferential finding as to Griffin's knowledge formed the exclusive basis upon which the Board inferred that Casey likewise knew of the message when he discharged Henson. This finding is no more than unsupported speculation "derived from inferences upon inferences," not substantial evidence. *Brown & Root, Inc.*, 333 F.3d at 639.

The Board also found that "Capstone essentially admitted that it discharged Henson because of the conduct found to be protected concerted activity." The Board pointed to the conversation between Casey and Capstone's Director Mike Ruder just before Casey fired Henson on October

---

not asking this court to overturn this finding, it urges the court to find that there is a lack of substantial evidence to support the inference that Casey knew about the message.

[10] The Board inferred that "Griffin learned about Henson's LinkedIn message" shortly after she sent it to Rouse. The Board's only basis for reaching this conclusion was that neither party excepted to the ALJ's "inference that Griffin learned of Henson's LinkedIn message before he approached Henson." After the ALJ reached this inference in its decision, the ALJ cited only to a portion of the transcript from Joyce Henson's testimony during which she testified that "a couple of hours after [the] meeting" with Capstone officials, "[Associated Wholesale Grocers'] manager Chris Griffin approached [her] while [she] was walking across the warehouse from the dry side to the cold side." But the ALJ offered no evidentiary support for its inference that Griffin got a call from Rouse or otherwise learned about Henson's LinkedIn message.

23, during which Casey said that he had decided to fire Henson because she "had gone to the partner with some concerns" after being told not to do so. The Board also noted that Casey told Henson that she was fired for what had transpired on October 22 and for disrupting Capstone's relationship with its business partner. According to the Board, Casey's statements "link [Henson's] discharge to her protected concerted activity in sending the LinkedIn message." Again, such an inferential conclusion is not supported by substantial evidence.

The record reflects that the "partner" Casey referred to was Associated Wholesale Grocers' Chris Griffin, not Donny Rouse. Casey and other Capstone personnel routinely refer to Capstone's customers, including Associated Wholesale Grocers, as its partners. And Rouse was not a customer or partner of Capstone, but of Associated Wholesale Grocers. This interpretation is further supported by an email that Casey sent to Capstone's Human Resources Department following Henson's termination in which he stated that Henson "went directly to the partner and was unprofessional and refused to listen to him." From the context of this email, it is clear that the inciting event involving a Capstone partner was Henson's October 22 interaction with Griffin, during which Henson was alleged to be "unprofessional" and "rude," not the LinkedIn message she sent to Rouse.

That Casey admittedly fired Henson for speaking with an Associated Wholesale Grocers' official, in direct contravention of Casey's earlier instructions not to bring concerns to the partner, does not lend any evidentiary support to the Board's conclusion that Henson was terminated for sending the LinkedIn message. As Casey himself acknowledged, he decided to let Henson go because "she did not follow [his] instructions" by going to Griffin, not because she contacted Rouse. For these reasons, we find that there is not substantial evidence to support the Board's conclusion that Henson was terminated for her protected LinkedIn message.

## B.

As an alternative basis upon which to find that Capstone violated Section 8(a)(1) of the NLRA, the Board concluded that Henson's discharge was motived by Capstone's belief that Henson had raised group employment complaints to Griffin during their October 22 interaction. There is sufficient evidence to support this finding by the Board.

In reaching its conclusion, the Board determined that if Capstone did not believe that Henson had brought group employment complaints to Griffin on October 22, "there would have been no reason for Casey to claim—when explaining the reason for her discharge—that Henson had violated his directive not to bring Capstone-related issues or concerns to [Associated Wholesale Grocers]." This finding was based, in part, on the voicemail Casey left on Henson's phone following her termination, in which Casey explained that Henson was discharged for disrupting business by "questioning the partner" after she was told to only take concerns to Capstone. Likewise, in the email to Capstone's Human Resources Department, Casey reiterated that he decided to terminate Henson's employment because she disobeyed his instruction not to go to the partner with Capstone-related concerns. And Capstone's Mike Ruder also testified that Casey told him he was discharging Henson because she "had gone to the partner with some concerns" and "[s]he had violated proper communication."

The Board further noted that Casey had good reason to believe that Henson raised group complaints to Griffin because Henson had raised group complaints to Capstone officials, including Casey, earlier that same day. That Casey himself had engaged in discussions of this nature with Henson and the other auditors, coupled with Casey's knowledge that Henson and the other auditors had previously raised group concerns to Griffin, is sufficient

circumstantial evidence to support the Board's inference that he at least suspected protected concerted activity. *See Remington*, 847 F.3d at 185 ("[I]t is sufficient if the employer was motivated by suspected [protected concerted] activity in discharging the employee.").

Accordingly, we find that there is sufficient evidence in the record to support the Board's finding that a motivating factor for Capstone's discharge of Henson was its belief that she had raised group employment complaints to Griffin on October 22. We therefore affirm the Board's conclusion that Capstone violated Section 8(a)(1) of the NLRA on this basis.[11]

## IV.

For the foregoing reasons, we DENY Capstone's petition for review and GRANT the Board's cross-application to enforce.

---

[11] While we find that there was not sufficient evidence for the Board to conclude that Henson was terminated for actually engaging in protected concerted activity, we affirm the Board on its alternative finding that Capstone terminated Henson because it believed Henson engaged in protected concerted activity. There is a sufficient indication that the Board would have reached the same outcome in finding that Capstone violated Section 8(a)(1) of the NLRA based solely on this alternative finding. The Board itself acknowledged that "even assuming Capstone did not actually know that Henson had sent that protected message, it unlawfully discharged her based on its belief that she engaged in other protected concerted activity."

No. 23-60513

HAYNES, *Circuit Judge*, dissenting:

I agree with the conclusion set out in Section III.A. of the majority opinion. However, I respectfully dissent from the conclusion in Section III.B. that results in an affirmance. I would reverse the Board and affirm the ALJ's judgment.

While it is true that employees can discuss group employment complaints with people outside of their company, in this case, the specific discussion with Griffin was a problem. Griffin worked for a customer of Capstone and complained earlier about Henson's comments. Griffin clearly did not want to hear more complaints from her. In a situation where a customer complains, it makes little sense to me to have the employee continue to bother that customer. In this case, it wasn't Henson discussing group issues, it was her complaining, indeed, having an unpleasant discussion, about her own issues with Griffin, at least as far as the Capstone group understood. The ALJ concluded that the NLRB General Counsel had not established that Henson's October 22 interaction with Griffin and subsequent discharge "concerned her protected activities as opposed to her desire . . . to increase her own compensation." That is what the ALJ relied upon in determining that her protected activity was not the reason for her firing.[1] Accordingly, I would affirm the ALJ's judgment, not that of the Board. Thus, I respectfully dissent.

---

[1] It is a bit unclear why she continually complained about her salary but wanted to continue to work for a company she thought pays too little.